**UNITED STATES of America, Appellee,**

v.

**Billy Lee JORGENSEN, Appellant.**

No. 87–2487.

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 18, 1988.

Decided March 21, 1989.

Rehearing and Rehearing En Banc Denied April 25, 1989.

Diane Stahle, Des Moines, Iowa, for appellant.

Linda R. Reade, Des Moines, Iowa, for appellee.

Before HEANEY,[*] Senior Circuit Judge, MAGILL, Circuit Judge, and LARSON,[**] Senior District Judge.

MAGILL, Circuit Judge.

In this case, the district court[1] dismissed a motion to suppress inculpatory statements made by a criminal suspect to federal investigators before he was arrested or charged. We agree with the district court's findings and accordingly affirm.

On October 26, 1987, Billy Lee Jorgensen pled guilty to two counts of transporting stolen goods in interstate commerce. However, Jorgensen, who subsequently received two concurrent three-year prison sentences, preserved his right to appeal from the district court's dismissal of his motion to suppress all statements he made when questioned in a FBI office on July 19, 1985. Jorgensen's motion asserted that his statements were inadmissible because they were obtained without proper *Miranda* warnings, by psychological coercion, and during plea bargaining negotiations.

## I. BACKGROUND

This case began with the theft of a tractor and trailer containing 40,000 pounds of Oscar Mayer meat products (valued at approximately $80,000). During the weekend of June 22, 1985, the meat trailer was shipped interstate. When the shipment reached Altoona, Iowa, it was stolen by a group authorities believed consisted of Billy Lee Jorgensen, his older brother Garry Jorgensen, David Atchley, and Dirk Sungle. Witnesses who had seen the thieves with the stolen meat trailer after it broke down in Monroe, Iowa identified photographs of Billy Lee Jorgensen and Mr. Atchley[2] on July 11, 1985. After the photo identifications, Special Agent David T. Oxler, a nineteen-year FBI veteran stationed at the Bureau's headquarters at 1 Corporate Place in West Des Moines, contacted Billy Lee Jorgensen to request an interview in regard to the meat trailer theft.

Oxler allowed Jorgensen to choose where and when to conduct the interview. Eventually, Jorgensen elected to be questioned in Oxler's office at approximately 10:00 a.m. on July 19, 1985. The office was located on the fifth floor of a large commercial office building that contains private businesses and the FBI offices. Oxler informed Jorgensen that he could either drive to the interview on his own, or a Bureau employee could "pick him up." Jorgensen believed that Oxler's wording was euphemistic and tacitly compelled him either to comply with Oxler's request to come in for questioning or to submit to immediate arrest and detention by the FBI. Oxler insists that he simply offered Jorgensen a ride to the FBI offices in case he had no other means of transportation.

Oxler emphasizes that although he encouraged Jorgensen to come in for questioning, it should have been apparent to Jorgensen that he was free to decline. Oxler stated during Jorgensen's suppression hearing that on "innumerable" occasions, suspects he wished to interview had refused to appear.

[*] The HONORABLE GERALD W. HEANEY assumed senior status on December 31, 1988.

[**] The HONORABLE EARL R. LARSON, Senior District Judge for the District of Minnesota, sitting by designation.

1. The Honorable Harold D. Vietor, Chief Judge, United States District Court for the Southern District of Iowa.

2. Atchley initiated the theft. The Jorgensens and Sungle came to assist him after the tractor broke down. Unable to repair the tractor, the thieves stole another one and hooked it to the meat trailer before escaping to Missouri.

Despite his suspicion that Oxler had ordered him to appear for questioning by applying subtle coercion, Jorgensen did appear at the West Des Moines FBI offices on the morning of July 19, 1985, along with his brother Garry. Jorgensen explained at the suppression hearing that Garry accompanied him for "support," because Jorgensen feared the interview would lead to his arrest. Oxler and Jorgensen have offered conflicting descriptions of the FBI headquarters and its atmosphere. Physically, it consisted of a small waiting room, a "squad room" occupied by several agents and their secretaries, and a supervisor's office (in which the interview of Billy Lee Jorgensen took place).

To Oxler, the two-hour interview was informal, routine and, under the circumstances, fairly friendly.[3] In contrast, Jorgensen insists that when Oxler led him in to be questioned, Oxler ordered Garry Jorgensen to stay in the waiting room and prepare to be questioned after his brother. Oxler apparently never informed either of the Jorgensens that they were free to leave. Nor did he give them *Miranda* warnings.

Jorgensen asserts that door buzzers, locking doors, agents with visible weapons, and other security devices in the FBI offices made him feel as though he were in custody. However, the offices had no holding cells or other facilities for detaining arrestees or suspects. In addition, the offices had no security guard on duty. All told, the record gives us two tales of one set of offices. We must consider whether the FBI offices were Oxler's innocuous bureaucratic workplace or Jorgensen's tacitly (but effectively) intimidating detention center.

Those present at the questioning were Oxler, Jorgensen and Officer Larry Streeter of the Altoona Police Department. Streeter had investigated the case when it was a local Altoona, Iowa matter. Agent Oxler led the investigation when Altoona relinquished the case to the FBI. Jorgensen claims that Streeter arrived late and added to the generally menacing atmosphere when he entered the interview room, unstrapped a gun, and hung it on a peg. Oxler and Streeter deny this. They recall that Streeter was there from the beginning and that they did not display weapons in Jorgensen's presence.

Oxler denies having made or even discussed any "deals" with Jorgensen. In contrast, Jorgensen testified that "Mr. Oxler told me that they did not want me or my brother. They wanted the higher up people, and if we would tell them everything that's happened, they will not bring no charges against us on the agreement that we were willing to testify against other people." Transcript at 60. Oxler recalls informing Jorgensen of photo identification evidence linking him to the meat trailer theft. *See supra* at 726. The FBI was planning a sting operation, he explained, since it suspected that "higher-up people" ordered the theft. Oxler testified that he explained the operation to Jorgensen and that he emphasized that full disclosure of his knowledge of the meat trailer theft would benefit him.

Oxler also testified that he explained that although he had evidence that Jorgensen had participated in the theft, he was primarily concerned with investigating the "higher-ups" who purchased the stolen meat trailer from the thieves. Therefore, Jorgensen probably could reduce his inevitable punishment by cooperating. According to Oxler, he routinely offers such advice, which falls short of making deals or promises but implies that leniency is obtainable, to criminal suspects.

Jorgensen listened to Oxler for a few minutes and then requested to confer with Garry Jorgensen. After walking alone to the waiting room and conversing with his brother, Jorgensen returned and discussed the theft with Oxler and Streeter. The two officials then found Jorgensen unusually "talkative." He told them that he and a

---

**3.** Oxler's testimony is based on his recollections of the interview and written notes he took and later had transcribed. Oxler testified that the FBI has a written rule forbidding tape recordings of non-undercover interviews.

colleague had received $15,000 for the stolen meat.

Later, Oxler concluded that Jorgensen was not only a willing interviewee, he was "almost a braggart in regard to all his [criminal] activities, and he was indicating * * * other things that were going on that he had knowledge of, [other] ongoing criminal activities." Transcript at 32. Officer Streeter's testimony at the suppression hearing supports Oxler's statement about Jorgensen's self-incriminating "bragging": "* * * he liked to brag about everything he liked to do, and he was trying to be a big time criminal and to impress us * * *. He * * * told us about * * * numerous thefts that he was involved in." Transcript at 52. Streeter also emphasized that Jorgensen "volunteered" the incriminating admissions and "was free to leave the room."

Two weeks after his interview, Jorgensen provided Oxler and Streeter with information that led to the arrest of the perpetrator of an unrelated crime. When Jorgensen was arrested for his participation in the meat trailer theft approximately two years after the interview with Oxler and Streeter, he was shocked to be charged after such a substantial lapse of time.[4] He believed his cooperation during and after the 1985 interview had earned him both immunity from prosecution for the meat trailer theft and protection from the "higher-ups." He claims (and Oxler denies) that when the July 19, 1985 interview ended, Oxler's parting words were "go lead a normal life. No charges will be filed against you if you testify." Garry Jorgensen also protested upon his arrest that he thought "a deal had been made" two years earlier.

## II. DISCUSSION

■ We apply a "clearly erroneous" standard of review when assessing a decision by the district court to deny a motion to suppress. *United States v. Eisenberg,* 807 F.2d 1446, 1449 (8th Cir.1986) (citing *United States v. Lewis,* 738 F.2d 916, 920

(8th Cir.1984), *cert. denied,* 470 U.S. 1006, 105 S.Ct. 1362, 84 L.Ed.2d 383 (1985)). Therefore, we must affirm unless the decision of the district court is unsupported by substantial evidence, based on an erroneous interpretation of applicable law, or, in light of the entire record, we are left with a firm and definite conviction that a mistake has been made. *United States v. Pantazis,* 816 F.2d 361, 363 (8th Cir.1987) (citing *United States v. Lewis,* 738 F.2d 916, 920 (8th Cir.1984), *cert. denied,* 470 U.S. 1006, 105 S.Ct. 1362, 84 L.Ed.2d 383 (1985)).

Jorgensen appeals the denial of his motion to suppress on three grounds:

(A) He was not adequately advised of his constitutional rights pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

(B) His confession was involuntary, stemming from promises of leniency and other forms of psychological coercion in violation of the fifth amendment of the United States Constitution.

(C) The July 19, 1985 interview constituted inadmissible plea bargaining negotiations under Fed.R.Crim.P. 11(e), (6)(D).

We address these grounds individually.

### A. No *Miranda* Warnings

■ The *Miranda v. Arizona* doctrine requires law enforcement officials to follow clearly defined procedures before interrogating criminal suspects in their custody. The Supreme Court defines custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda,* 384 U.S. at 444, 86 S.Ct. at 1612. *See also United States v. Venerable,* 807 F.2d 745, 747 (8th Cir.1986). When considering whether a suspect is in custody for *Miranda* purposes, a court must consider the totality of the circumstances. *United States v. Rorex,* 737 F.2d

---

**4.** After the arrest, which occurred in July 1987, the police read Jorgensen the *Miranda* warnings. Subsequently, Jorgensen reaffirmed much of the information about the meat trailer theft that he provided in the interview of July

19, 1985. Transcript at 92–93. We are uncertain whether Jorgensen confessed fully in the 1987 statement, but a remand is unnecessary because we will proceed directly to the merits of his 1985 confession.

753, 755 (8th Cir.1984). *See also United States v. Helmel,* 769 F.2d 1306, 1321 (8th Cir.1985). The *Miranda* safeguards only apply to interrogation in a custodial setting. *Miranda,* 384 U.S. at 477–78, 86 S.Ct. at 1629–30.

■ We agree with the district court that Jorgensen, during his questioning on July 19, 1985, was not entitled to the protections afforded to criminal suspects by *Miranda* because he was not in custody.

Jorgensen was not placed under arrest. The officers allowed him to go by himself to an unlocked, unguarded section of the FBI offices to speak to his brother. This kind of latitude is clearly inconsistent with custodial interrogation, the situation without which the procedural safeguards of *Miranda* do not come into effect. We are not persuaded that Jorgensen's freedom of action was significantly limited during the interview. Agent Oxler has testified that "I had no question in my mind that [the interview] wasn't custodial * * *. I had no intention of making an arrest * * *. I didn't think we were close to a situation requiring the invocation of the *Miranda* rights." Transcript at 28. We agree with Oxler's assessment.

The United States Supreme Court's opinion in *Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977), is on point. The Court explained that " * * * police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.' " *Id.* at 495, 97 S.Ct. at 714.

Since Jorgensen has failed to demonstrate that he was subjected to custodial interrogation, we do not find the district court's dismissal of his *Miranda* claim clearly erroneous.

### B. Voluntariness

■ Jorgensen's second argument against the admissibility of his admissions is that they were involuntary: obtained through promises of leniency and other forms of psychological coercion. He asserts that because of the physical layout and atmosphere of the FBI offices and the substance of Oxler and Streeter's questioning, he was intimidated and consequently spoke involuntarily.

Voluntariness remains the standard for the admissibility of confessions. *See Brown v. Mississippi,* 297 U.S. 278, 279, 285, 56 S.Ct. 461, 462, 464, 80 L.Ed. 682 (1936) (the use of involuntary confessions violates due process). The test used to apply this constitutionally based standard is whether, in light of the totality of the circumstances, pressures exerted upon the suspect have overborne his will. *Haynes v. Washington,* 373 U.S. 503, 513–14, 83 S.Ct. 1336, 1343, 10 L.Ed.2d 513 (1963); *see also Culombe v. Connecticut,* 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961) (suspect's will is overborne when a confession is not the product of an essentially free and unconstrained choice). The Eighth Circuit has also embraced the "overborne will" doctrine. *See Rachlin v. United States,* 723 F.2d 1373, 1377 (8th Cir.1983). Two factors must be considered in the voluntariness inquiry: the conduct of the law enforcement officials and the capacity of the suspect to resist pressure to confess. *Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 518–19, 93 L.Ed.2d 473 (1986).

Although there does appear to have been a mildly coercive atmosphere at the FBI offices during Jorgensen's interview, we are not persuaded that it rose to the level of a constitutional violation. Moreover, the United States Supreme Court, in *Mathiason, see supra* at 729, has emphasized that "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a

crime." *Mathiason*, 429 U.S. at 495, 97 S.Ct. at 714.

It is true that Oxler and Streeter, by informing Jorgensen that they had eyewitness testimony identifying him as one of the meat trailer thieves, created a situation in which he was fearful of imminent arrest. Plus, the evidence does appear to support Jorgensen's testimony that with its buzzers, locking doors, and armed agents, the FBI offices in West Des Moines in some ways do resemble a police station house.

However, it is equally true that Jorgensen never asked over the course of two hours to stop the interview except when he paused for the brief discussion with his brother. Also, since Jorgensen had previously experienced the ordeal of arrest and custodial detention, his argument that he was intimidated by the ambiance of an office with no security guards or holding cells—an office in a rather plain and unthreatening commercial office building—merely because it had doors with locks and buzzers is not persuasive. As we noted earlier, Oxler permitted Jorgensen to choose the time and place of the interview and to walk unescorted to the waiting room to speak to his brother. Overall, we are not convinced that official coercion or his own incapacity to withstand the pressure of the interview scenario caused Jorgensen to confess to his participation in the meat trailer theft. Rather, he appears to have agreed, either on his own or in conference with his brother, with the advice offered by Agent Oxler: the surest means of limiting his punishment was to speak candidly to Oxler and Streeter. Jorgensen's candor did not obtain for him the lenient "deal" that he had hoped for, but since we see no evidence that the officers made direct or implied promises other than to inform other law enforcement authorities of Jorgensen's cooperation, we agree with the district court that there was no fifth amendment violation.

C. Fed.R.Crim.P. 11(e)(6)(D)

■ Jorgensen's third argument is that his admissions during the July 19, 1985 interview were inadmissible because he reasonably believed the interview constituted a plea bargaining negotiation. He supports his claim by citing Fed.R.Crim.P. 11(e)(6)(D):

(e) **Plea Agreement Procedure.**

\* \* \* \* \* \*

(6) **Inadmissibility of Pleas, Plea Discussions, and Related Statements.** Except as otherwise provided in this paragraph, evidence of the following is not, in any civil or criminal proceeding, admissible against the defendant who made the plea or was a participant in the plea discussions:

\* \* \* \* \* \*

(D) any statement made in the course of plea discussions with an attorney for the government which do not result in a plea of guilty later withdrawn.

Oxler and Streeter clearly are not "attorneys for the government" for Rule 11(e)(6)(D) purposes, but *Rachlin v. United States*, 723 F.2d 1373, 1376 (8th Cir.1983), indicates that when law enforcement officials have express authority from government attorneys to act as their surrogates, statements made to them by a criminal suspect are inadmissible.

In this case, Oxler and Streeter were not engaged in plea bargaining negotiations. The U.S. Attorney's office gave the officers no authority to bargain. Indeed, it was not informed that an investigation of the meat trailer theft was taking place. Since there was no plea bargaining or requisite authority to bargain, the district court's conclusion that Rule 11(e)(6)(D) does not protect Jorgensen is not clearly erroneous.

III. CONCLUSION

The district court's conclusions that Jorgensen was not entitled to *Miranda* warnings, that he made his admissions voluntarily, and that he was not entitled to the protections afforded by Fed.R.Crim.P. 11(e)(6)(D) are supported by substantial evidence in the record. Finding no clear error in the district court's dismissal of Jorgensen's motion to suppress his statements of July 19, 1985, we affirm.

HEANEY, Senior Circuit Judge, dissenting.

I dissent. I would reverse and remand this case because the district court's opinion does not reveal whether the appropriate legal standards under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), were applied.

### I. The Test for Custody

The ultimate test for whether someone is in custody is whether their freedom of action is deprived in any significant way. *Id.* at 444, 86 S.Ct. at 1612. In some post-*Miranda* cases, the Court has reached its ultimate conclusion with respect to custody by close attention to the facts accompanied by inferential conclusions, without articulating clear and more general guides for other courts to use in different cases. *See, e.g., Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (per curiam), upon which the majority relies; *see also California v. Beheler,* 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (per curiam).[1]

The Supreme Court's recent discussion of custody in *Berkemer v. McCarty,* 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), has helped clarify the inquiry. Because *Miranda* jurisprudence had long focused on the pressures felt by the individual being questioned, the Court declared "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Id.* at 442, 104 S.Ct. at 3151 (emphasis added) (adopting the view Justice Marshall had urged in dissent in *Oregon v. Mathiason,* 429 U.S. at 496, 97 S.Ct. at 714).

*Berkemer* has changed how courts approach their case-by-case determination of whether the *Miranda* warnings were required.[2] Our Circuit's reaction to *Berkemer,* however, has been less clear. In *United States v. Helmel,* 769 F.2d 1306, 1320 (8th Cir.1985), we simply indicated that a "court should consider the totality of circumstances. The accused's freedom to leave the scene and the purpose, place and length of interrogation are all relevant factors in making this determination. *Berkemer* * * *.*" We never indicated that the circumstances were to be viewed from the citizen's perspective. *See also, United States v. Richmann,* 860 F.2d 837 (8th Cir.1988); *United States v. Venerable,* 807 F.2d 745 (8th Cir.1986); *United States v. Baswell,* 792 F.2d 755 (8th Cir.1986). In *Wilson v. Coon,* 808 F.2d 688, 689 (8th Cir.1987), however, though we did not announce any change in our approach, we did use the reasonable person perspective. Similarly, in *Leviston v. Black, supra* note 2, in light of *Berkemer,* we analyzed the interrogation from the perspective of a reasonable person in the defendant's position. Four months later, however, we seemingly diluted the importance of *Leviston* by treating the reasonable person perspective as just another factor to be considered in conjunction with the purpose, place and length analysis advocated by *Helmel.* *United States v. Goudreau,* 854 F.2d 1097, 1098 (8th Cir.1988).

---

**1.** At the same time, various circuit courts adopted their own general set of standards for determining when the right to the *Miranda* warnings attached. *See, e.g., United States v. Lueck,* 678 F.2d 895, 900, *reh'g denied* 695 F.2d 566 (11th Cir.1982); *United States v. Warren,* 578 F.2d 1058, 1071 (5th Cir.1978) (en banc), *cert. denied* 446 U.S. 956, 100 S.Ct. 2928, 64 L.Ed.2d 815 (1980). We have also on occasion parsed our inquiry into similar elements. *United States v. Rorex,* 737 F.2d 753, 755–56 (8th Cir.1984). In other cases, we have applied *Miranda* through a process of factual analogy. *See, e.g., United States v. Dockery,* 736 F.2d 1232 (8th Cir.) (en banc), *cert. denied,* 469 U.S. 862, 105 S.Ct. 197, 83 L.Ed.2d 129 (1984), comparing the facts to those in *United States v. Jones,* 630 F.2d 613 (8th Cir.1980) (per curiam).

**2.** The Fifth Circuit has completely abandoned its former test in light of *Berkemer* and *Minnesota v. Murphy,* 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984). *United States v. Bengivenga,* 845 F.2d 593, 596–97 (5th Cir.) (en banc), *cert. denied,* — U.S. —, 109 S.Ct. 306, 102 L.Ed.2d 325 (1988). The Eleventh Circuit has also changed its approach, recognizing that the "Supreme Court has recently narrowed the focus of analysis * * *." *United States v. Phillips,* 812 F.2d 1355, 1359 (11th Cir.1987) (per curiam). Our decision in *Rorex* is now similarly outmoded. *See Minnesota v. Murphy,* 465 U.S. at 431, 104 S.Ct. at 1144; *Leviston v. Black,* 843 F.2d 302, 304 (8th Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 168, 102 L.Ed.2d 138 (1988).

Our opinions have lacked both the clear statement that under *Berkemer* custody is to be judged from the perspective of the reasonable citizen, and a discussion of how such an inquiry should proceed. Other courts have been more helpful in explaining how the situation may be evaluated from the citizen's perspective. The Ninth Circuit has used a form of the reasonable person test for many years. *See, e.g., United States v. Booth,* 669 F.2d 1231, 1235 (9th Cir.1981); *Lowe v. United States,* 407 F.2d 1391, 1396–97 (9th Cir.1969). Over the years, that circuit has come to focus on five factors in determining whether a reasonable person would believe that they were in custody:

One. The language used by the officers in summoning the person interviewed.

Two. The physical characteristics of the place where the interrogation occurred.

Three. The degree of pressure applied to detain the individual.

Four. The duration of the detention.

Five. The extent to which the person was confronted with evidence of his guilt.

*United States v. Hudgens,* 798 F.2d 1234, 1236 (9th Cir.1986).

The benefit of such an approach is that it gets the parties and the district courts to focus on, and to analyze, specific facts in determining whether the individual was in custody. While a focus on specific factors may not completely eliminate the often conclusionary nature of the inquiry, it is far preferable to a less structured and more idiosyncratic style of decision-making.

II. The District Court Opinion

The district court's entire consideration of whether Jorgenson was in custody was as follows:

Defendant's statements were made in an interview of him by Agent Oxler and Officer Streeter in the FBI's offices in West Des Moines, Iowa, on July 19, 1985. Defendant and his brother, Garry, in their testimony on behalf of defendant, recalled the events of that day over two years ago somewhat differently than the events were recalled by Agent Oxler and Officer Streeter in their testimony. THE COURT FINDS THAT AGENT OXLER AND OFFICER STREETER ARE THE MORE CREDIBLE WITNESSES, AND FINDS THE EVIDENTIARY FACTS TO BE AS TESTIFIED TO BY AGENT OXLER AND OFFICER STREETER. In respect to the question of whether any promises were made by the officers to defendant, the court finds that Agent Oxler told defendant, before defendant made any substantive statements, that *"his cooperation would be made known and it would probably help him."*

The *Miranda* rights were not given to defendant, but the court finds as an ultimate fact amply supported by the evidence that defendant was not in custody or the functional equivalent of custody, so giving of the *Miranda* rights was not required.

Ruling Denying Motion to Suppress at 1 (Aug. 26, 1987) (capitalization added).

As is apparent, the district court did not in its decision (or in any remarks on the record) specify what facts it found or how it used those facts to reach its legal conclusion. The district court only indicated that it credited the officers on every disputed point.

The district court's decision is inadequate for several reasons. First, there is no indication that the district court understood what standards were to be applied in evaluating the evidence. Given the condition of the district court's opinion, this is an appropriate case for illuminating those standards. Second, the district court may in this case have been too deferential to the officers' impressions of the situation. Because the district court did not discuss any of the evidentiary disputes between the parties, it is not apparent whether the district court separated the officers' statements of fact from the officers' impressions. Finally, there is no indication that the facts were analyzed from the citizen's perspective. In fact, the majority opinion includes in its factual summary circum-

stances that would arguably have not been apparent to anyone in Jorgenson's position.

The majority presumably derived its factual presentation from reading the transcript of the suppression hearing and resolving disputed facts in the government's favor. Assuming without deciding that the district court's one-sentence fact-finding should make us operate in this way, I still take exception to the majority's presentation of the historic facts.

First, while the majority says that Jorgenson was told that he could choose where the interview would take place, his choices may have only been between the Altoona Police Station or the FBI office. Agent Oxler could only recall his standard policy; Officer Streeter and Jorgenson believed there were only two "choices." Transcript of the Hearing on the Motion to Suppress at 7, 49 and 56 (August 24, 1987). Thus, crediting both the officers either leads to an inconsistency or to the conclusion that Oxler did tell Jorgenson that he had to come to the FBI offices or the police station. The majority simply elects which officer to credit. Second, Jorgenson did not *suspect* that Agent Oxler's wording was merely euphemistic and only tacitly compelling; Jorgenson testified that Oxler said that he had to come in for questioning "or we will come and get you." *Id.* at 57. Nor would characterizing Oxler's desire to question Jorgenson as somehow ambivalent make any sense if Oxler's testimony is to be credited—"we had him identified through a photographic display as being involved in the theft, that I had no question at all that he was one of the people involved in the theft, and that I felt we could prove it from our investigation * * *." *Id.* at 11. Therefore, because—rather "than despite" his understanding of Oxler's request, Jorgenson went to the FBI office, unaware, as a reasonable person might be unaware, that others allegedly sometimes refused similar requests.

Third, there is no evidence in the record that Jorgenson or any reasonable person would think that the police-dominated aspects of the office were merely "tacit," unspoken or silent. Jorgenson was proba-

bly unaware that the office had no holding cells or other detention facilities. A reasonable person might have assumed that they did. It is undisputed that the agents in the outer office were armed, and that the office was replete with security devices and locking doors that closed behind Jorgenson as he entered. That Oxler may have thought *from his perspective* that the interrogation was "informal, routine" and "fairly friendly" is irrelevant. As the majority concedes without even analyzing the situation from Jorgenson's perspective, "there does appear to have been a mildly coercive atmosphere at the FBI offices during Jorgenson's interview * * *." *Ante* at 729.

## CONCLUSION

Today, *Miranda* and its progeny represent a still maturing area of law. As a result, we must from time to time clarify the existing state of that law. Accordingly, I would remand this case to the district court for consideration in light of *Berkemer* and the five factors outlined in *Hudgens.* I am convinced that the district court did not analyze the setting in the FBI's office and the statements of Agent Oxler from the perspective of the citizen being questioned. Quite frankly, the dispute in this case between the government and Jorgenson really is not over physical facts, such as the layout of the office. What the parties really disagree over is the impression created by that setting and Oxler's ambiguous statements about "coming to get you" and telling the brother "don't leave." Deciding that the officers are credible does not generate a conclusion about what impression was created. Oxler's intentions and impressions are irrelevant, except as they may have been communicated to Jorgenson and affected the view of a reasonable person in Jorgenson's position. *Minnesota v. Murphy*, 465 U.S. at 431, 104 S.Ct. at 1144. Whether someone is in custody is to be judged from the perspective of the least informed party about the nature of the police's control, intentions or layout

of the office—the person being questioned.[3]

---

**3.** Similarly, I disagree with the majority's application of a clearly erroneous standard to our review. *Ante,* at 728 (relying on suppression cases involving wiretaps and searches and seizures). There is a split in the federal circuit courts over whether "custody" is a mixed question of law and fact. *See, e.g., United States v. Hocking,* 860 F.2d 769, 772 (7th Cir.1988) (mixed question, affirming); *United States v. Calisto,* 838 F.2d 711, 717–18 (3rd Cir.1988) (same, affirming); *United States v. Jimenez,* 602 F.2d 139, 142–43 (7th Cir.1979). *But see, United States v. Poole,* 806 F.2d 853, *amending,* 794 F.2d 462 (9th Cir.1986) (fact question, reversing); *United States v. Mahar,* 801 F.2d 1477, 1500, n. 38 (6th Cir.1986) (same); *United States v. Charles,* 738 F.2d 686, 688 (5th Cir.1984) (same, reversing). In *Leviston,* we may have treated custody as a legal conclusion. 843 F.2d at 304–05. *But see, Venerable,* 807 F.2d at 747; *Helmel,* 769 F.2d at 1321.

A final conclusion in this circuit over which path to follow should await an appeal where the issue is subject to consideration and discussion. When we do face the issue, we must decide it in light of the precedent pertinent to *Miranda* jurisprudence, rather than suppression law generally.

"Custodial interrogation" is a legal term of art central to *Miranda* jurisprudence, and a decision whether or not "custodial interrogation" occurred is a matter of law to be determined in accordance with the policies underlying the *Miranda* rule. The legal nature of the determination is evidenced by the numerous Supreme Court decisions deciding whether certain facts constitute "custody" or "interrogation." See, e.g., *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); *Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977); *Orozco v. Texas,* 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969). Accordingly, an appellate court is free to re-examine the trial court's legal conclusion as to the applicability of the *Miranda* rule. The standard of appellate review does not change simply because the legal determination in a *Miranda* situation depends on the particular facts of each case. *United States v. Mesa,* 638 F.2d 582, 591 n. 3 (3rd Cir.1980) (Adams, J., concurring). *Compare United States v. Booth,* 669 F.2d at 1235–36.

In my view, it is especially inappropriate to accord such deference to a district court's conclusion where the district court did not apply relevant standards and where its method of fact-finding leaves us with a confusing muddle on appeal.