For the reasons discussed above, the decision of the district court is affirmed.

**UNITED STATES of America, Appellee,**

v.

**William A. McCLINTON, Appellant.**

**No. 92-1700.**

United States Court of Appeals, Eighth Circuit.

Submitted Aug. 4, 1992.

Decided Dec. 16, 1992.

Rehearing Denied Jan. 29, 1993.

Susan M. Hunt, Kansas City, MO, argued, for appellant.

Linda L. Parker, Kansas City, MO, argued, for appellee.

Before FAGG, BOWMAN, and HANSEN, Circuit Judges.

HANSEN, Circuit Judge.

William A. McClinton entered a conditional plea of guilty to a one-count indictment charging him with transporting a female child under the age of twelve, who had been kidnapped for the purpose of sexual abuse, in interstate commerce from Kansas City, Missouri, to Kansas City, Kansas, in violation of 18 U.S.C. § 1201(a)(1) and (g)(1)(A). The district court [1] sentenced McClinton to life in prison. McClinton appeals, pursuant to his conditional plea, from the trial court's denial of his motion to suppress the statements and the 40–minute videotaped confession he made to police officers during an interrogation session. McClinton contends that the police violated his Fifth Amendment rights by questioning him after he had invoked his right to remain silent. He further contends that he did not voluntarily waive his right to remain silent. We affirm the district court's order.

## I. Facts

Because, after a review of the entire record, we do not find the magistrate judge's factual findings as adopted by the district court to be clearly erroneous, we recite them in an abbreviated form. During - September and October 1991 four young girls, ages six and seven, living in Kansas City, Missouri, were abducted, taken to other locations in the Kansas City metropolitan area, and sexually assaulted before being released. The ensuing police investigation focused on McClinton. On October 31, 1991, the investigating authorities held a press conference and announced

---

1. The Honorable Joseph E. Stevens, Jr., United States District Judge for the Western District of Missouri.

the filing of both federal and state criminal complaints against McClinton and the issuance of warrants for his arrest.

On November 2, 1991, at about 9:30 p.m., Trooper Bradley Carnduff of the Illinois State Police was on routine highway patrol on Interstate 55 near Springfield, Illinois, and noticed a car whose driver, McClinton, seemed very nervous. Trooper Carnduff started to follow the car while he called the police dispatcher and had a computer search performed on the license plate number. When the search came back clear, Trooper Carnduff proceeded to pull around the car. At the same time, McClinton slowed down to 35 m.p.h. and signaled a right turn. There was no exit. Trooper Carnduff then decided to investigate and turned on his red lights. McClinton started to drive his car onto the shoulder of the road, but suddenly sped away. A high-speed chase ensued. McClinton's car eventually collided with a second police car in Springfield, and he was apprehended.

When asked if he had been drinking, McClinton said "yes." Trooper Carnduff administered a breathalyzer test, which revealed that McClinton was intoxicated according to Illinois law. Trooper Carnduff then called the police dispatcher and was informed that a kidnapping warrant was outstanding for McClinton. He arrested McClinton and transported him to the Sangamon County, Illinois, jail at approximately 10:30 p.m., at which time the police booked McClinton for several traffic violations.

McClinton was placed in a holding cell around midnight. At approximately 1:55 a.m., Trooper Carnduff and Sergeant Daniel Fruge of the Illinois State Police entered McClinton's cell for the purpose of interviewing him and learning more about the car, which was reported stolen from St. Louis. The officers awakened McClinton, who acted extremely tired and drunk (McClinton later testified that he had been drinking alcohol and smoking crack cocaine that day), and read him his *Miranda* [2] rights. *See* Hearing Transcript (H.Tr.) at 214–15. McClinton indicated he understood his rights. The officers then inquired about the stolen car, a bloody towel observed on the front seat next to McClinton, and the federal kidnapping warrant in general out of their concern for a potential kidnapping victim who might be in danger. McClinton said that he had paid $30 to someone at a liquor store in St. Louis to use the car, which he later admitted at the suppression hearing was not true, *see* H.Tr. at 203, that the blood on the towel was his from cutting his own hand, and that he knew little about the warrant. The car had a broken left rear window, a screwdriver found in the car looked like it had been used to gain entry into the car, and no keys were in the ignition. *See* H.Tr. at 9.

McClinton then indicated that he did not want to talk anymore. McClinton looked very tired, and the officers believed he wanted to go back to sleep. Both before and after McClinton indicated that he did not want to talk anymore, the officers asked if he wanted a lawyer. McClinton said "no" both times. The entire discussion lasted five to ten minutes. Neither officer had any specific knowledge about an investigation then currently ensuing in Kansas City, Missouri, concerning the abduction of the young girls. The officers only knew in general that an arrest warrant had been issued in McClinton's name for kidnapping. H.Tr. at 15–16, 24–28, 42, 44, 51.

During that same evening of November 2, 1991, detectives in Kansas City learned about McClinton's arrest in Springfield, Illinois. Detectives Garry Wantland and Jeffrey Kleinow were instructed to interview McClinton. They drove that night and arrived the next morning at 9 a.m. in Springfield, Illinois. The detectives first talked briefly with Trooper Carnduff, who described the events leading up to McClinton's arrest. Nobody told the Kansas City detectives that McClinton had been interviewed during the previous night or that McClinton had said he did not want to answer any more questions. The Kansas City detectives then drove to the county jail to interview McClinton.

2. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Once at the county jail, the detectives were seated in a private interviewing room. McClinton was brought into the room. The detectives introduced themselves to McClinton and indicated that they wanted to talk about the abductions of the young girls in Missouri. The detectives read McClinton his *Miranda* rights. McClinton also read the *Miranda* waiver form out loud, indicated that he understood his rights, and signed the waiver form at 10 a.m. on November 3, 1991.

The detectives talked with McClinton for approximately 50 minutes. During this time, the detectives attempted to develop a general rapport with him. Eventually McClinton began to discuss the abductions in detail. McClinton never indicated that he wanted a lawyer or that he wanted the questioning to stop. Before inquiring about each separate incident, the detectives reminded McClinton of his *Miranda* rights. He acknowledged his rights and continued to talk. At the end, the detectives asked McClinton if he would consent to a videotaped interview. McClinton agreed. The videotaped interview lasted approximately 40 minutes. During this entire interview, the detectives provided cigarettes and soda to him.

According to McClinton's testimony, the detectives threatened him with 25 years in prison unless he spoke to them without an attorney and unless he admitted his involvement in the abductions. He also alleges that he asserted his right to remain silent and that he repeatedly requested an attorney. The district court found his testimony not to be credible and denied his motion to suppress the statements and the videotaped confession.

## II. *Discussion*

McClinton argues that the district court erred in denying his motion to suppress his statements made to the detectives because (1) the detectives did not honor his right to remain silent and (2) he did not voluntarily waive his right to remain silent. "We review the district court's decision to deny the defendant's motion to suppress under a clearly erroneous standard." *United*

*States v. Meirovitz,* 918 F.2d 1376, 1379 (8th Cir.1990) (citing *United States v. Williams,* 917 F.2d 1088, 1090 (8th Cir. 1990)), *cert. denied,* —— U.S. ——, 112 S.Ct. 101, 116 L.Ed.2d 71 (1991). "Therefore, we must affirm the district court unless its decision is 'unsupported by substantial evidence, based on an erroneous interpretation of applicable law, or, in light of the entire record, we are left with a firm and definite conviction that a mistake has been made.'" *Id.* (quoting *United States v. Jorgensen,* 871 F.2d 725, 728 (8th Cir.1989)).

### A.  Right to Remain Silent

Once in police custody and subject to interrogation, a person must be informed of his constitutional right to remain silent. *Miranda v. Arizona,* 384 U.S. 436, 473, 86 S.Ct. 1602, 1627, 16 L.Ed.2d 694 (1966). If the right is asserted, the interrogation must cease. When a suspect invokes the right, however, the police are not entirely prohibited from reinitiating questioning. *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). Nothing "in the *Miranda* opinion can sensibly be read to create a *per se* proscription by any police officer on any subject, once the person in custody has indicated a desire to remain silent." *Id.* at 102–03, 96 S.Ct. at 326. Instead, "the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'" *Id.* at 104, 96 S.Ct. at 326. In *Mosley,* the Supreme Court relied on three factors to determine whether the police "scrupulously honored" the person's right of silence: "(1) there was an immediate cessation of questioning upon defendant's request; (2) a 'significant amount of time' had passed since the last session and a new set of [*Miranda*] warnings was given; and (3) the second interrogation involved inquiries concerning a separate crime." *United States v. House,* 939 F.2d 659, 662 (8th Cir.1991) (citing *Mosley*).

■■■ Applying the factors from *Mosley,* we hold that McClinton's Fifth Amendment right to remain silent was not violat-

ed. First, Trooper Carnduff and Sergeant Fruge ended their questioning when McClinton said he did not want to answer any more questions. Second, the Kansas City detectives began their interrogation of McClinton nearly seven hours after the first interview, which is a significant amount of time. *See Mosley*, 423 U.S. at 106, 96 S.Ct. at 327 (the passage of two hours between interrogations was held to be a significant amount of time). The detectives read McClinton his *Miranda* rights at the start of the second interrogation. He acknowledged that he understood his rights and signed a written waiver. As to the final factor, the Kansas City detectives restricted their questioning to the specifics about the abductions of the young girls in Missouri, which was the specific subject matter of their investigation. In contrast, the topics of the brief earlier questioning by Trooper Carnduff and Sergeant Fruge involved the stolen car, the bloody towel, and the arrest warrant.

█ McClinton argues that the general subject matter during both questioning periods related to the kidnapping crime. Even if we were to agree with McClinton, which we do not, "a second [questioning] is not rendered unconstitutional simply because it involves the same subject matter discussed during the first questioning." *House*, 939 F.2d at 662 (citations omitted). As long as new *Miranda* warnings are given to the person and the person's initial request to remain silent is scrupulously honored, statements from subsequent interrogations on the same subject are admissible. *Id.* (citing *Jackson v. Wyrick*, 730 F.2d 1177, 1180 (8th Cir.), *cert. denied*, 469 U.S. 849, 105 S.Ct. 167, 83 L.Ed.2d 102 (1984), and *United States v. Finch*, 557 F.2d 1234, 1236 (8th Cir.), *cert. denied*, 434 U.S. 927, 98 S.Ct. 409, 54 L.Ed.2d 285 (1977)). The Kansas City detectives repeatedly advised McClinton of his *Miranda* rights both orally and in writing. Moreover, McClinton acknowledged that he understood his rights, signed a written waiver, and proceeded to answer the detectives' questions. The detectives scrupulously honored McClinton's rights.

We also find that this is not a case where the detectives persisted in "repeated efforts to wear down [the person's] resistance" in order to change the person's version of the facts. *See Mosley*, 423 U.S. at 105–06, 96 S.Ct. at 327. The Kansas City detectives were not aware that McClinton had previously been questioned or that he indicated to the Illinois officers that he did not want to answer any more questions.

**B. Voluntary Waiver**

█ McClinton next argues that the statements he made to the Kansas City detectives were involuntarily obtained and, therefore, should be suppressed. He contends that the detectives improperly induced him to confess to abducting the young girls in Missouri by promising leniency and drug and alcohol treatment. Because of these alleged improper inducements, McClinton claims he did not voluntarily waive his right to remain silent. We disagree.

█ The appropriate test for determining the voluntariness of a confession is "'whether, in light of the totality of the circumstances, pressures exerted upon the suspect have overborne his will.'" *United States v. Jorgesen*, 871 F.2d 725, 729 (8th Cir.1989). In applying the "overborne will" doctrine, a reviewing court must consider the conduct of the law enforcement officials and the capacity of the suspect to resist pressure to confess. *Id.* (citing *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986)).

First, regarding the conduct of the detectives during the interrogation, McClinton contends that his "statements were obtained through the use of direct and implied promises and improper inducement by law enforcement officers." Brief for appellant at 17. After thoroughly reviewing the entire evidentiary record, we conclude that the detectives did not directly or indirectly make any promises to McClinton or engage in any coercive threats. Detective Kleinow admitted that he told McClinton that the crimes in question carried a very long sentence. *See* H.Tr. at 161–62. Both detectives testified, however, that they did

not discuss the possibility of McClinton receiving a more lenient sentence if he would confess. *See* H.Tr. at 143, 148. The detectives did admit that in an effort to develop a general rapport with McClinton, they told him that he was not a bad person and that he would receive help for his drug and alcohol problems if he talked to them. These promises to help McClinton with his collateral health problems are far different from promises of leniency in the criminal proceeding. *See Miller v. Fenton,* 796 F.2d 598, 612 (3d Cir.), *cert. denied,* 479 U.S. 989, 107 S.Ct. 585, 93 L.Ed.2d 587 (1986).

Second, regarding McClinton's personal characteristics and his ability to resist pressure to confess, the presentence investigation report indicates that McClinton had an extensive prior criminal record: eight prior convictions, five of which were municipal violations and two of which were state offenses, and five additional prior arrests that did not result in prosecution. *See* presentence investigation (PSI) report at 12–18. Moreover, he had earned a high school diploma, had been married and divorced, had been incarcerated on a previous conviction, and enrolled in a cosmetology school at the time of the offense. *Id.* at 23, 26.

Finally, the detectives made every effort to make McClinton feel at ease. The detectives provided McClinton with soda and cigarettes on a regular basis and offered him food during the questioning period. The detectives repeatedly advised McClinton of his *Miranda* rights throughout the questioning. The detectives asked open-ended questions and exhibited no pressure or anger when McClinton disagreed with their allegations of fact or characterizations of the evidence. Moreover, the detectives gave McClinton ample opportunities to supplement the record with any additional statements that he wished to make.

After reviewing the totality of the circumstances surrounding the interrogation by the Kansas City detectives, we conclude that the government met its burden of proving by a preponderance of the evidence that McClinton's statements were made

voluntarily. *See Colorado,* 479 U.S. at 167–69, 107 S.Ct. at 521–22. McClinton's free will was not overborne. Furthermore, we are not left with a firm and definite conviction that the district court erred in denying McClinton's motion to suppress.

III. *Conclusion*

Accordingly, we affirm the order of the district court.