**UNITED STATES of America,
Plaintiff–Appellee,**

v.

Kevin M. **HARE**, Defendant–Appellant.

No. 94–1812.

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 14, 1994.

Decided March 7, 1995.

Rehearing Denied April 5, 1995.

Martin Warhurst, Kansas City, MO, argued, for appellant.

Daniel Stewart, Asst. U.S. Atty., argued, for appellee.

Before FAGG, WOLLMAN, and HANSEN, Circuit Judges.

HANSEN, Circuit Judge.

Kevin M. Hare was convicted by a jury of four counts of wire fraud, in violation of 18 U.S.C. § 1343, and three counts of money

laundering, in violation of 18 U.S.C. § 1957. The district court[1] sentenced Hare to a 46–month term of imprisonment and a fine of $5,250. In this direct appeal, Hare challenges the district court's denial of his motion to suppress statements that he alleges were made in the course of plea negotiations, the denial of his motion to dismiss the money laundering counts, the assessment of a two-level increase at sentencing for a specific offense characteristic, and the assessment of a two-level increase at sentencing for obstruction of justice. We affirm.

## I.

In the early 1990s, Kevin M. Hare, a Kansas City attorney in private practice, and his long-time acquaintance Raymond Sermon became involved in a scheme to defraud Ferrell T. Riley, the owner of an insurance company. Riley had been unable to obtain a license to operate his insurance company in Missouri due to his questionable business practices, and Hare and Sermon led Riley to believe that they could obtain a license for him if he paid bribe money to certain Missouri officials, namely a senator and the state insurance commissioner. Hare recruited long-time friend Robert Weller to play the role of the insurance commissioner. During a telephone conversation with Riley, Weller (feigning to be the Missouri Insurance Commissioner and using a script prepared by the defendant Hare) instructed Riley to send payments to accounts that Hare and Sermon had opened in their own names at two banks.

A series of banking and wire transactions followed from May through August 1991 as Riley succumbed to the scheme. Riley transferred money in amounts totalling $300,000 from his insurance company's accounts into the accounts opened by Hare and Sermon, which Hare and Sermon then converted for their own use. These transactions formed the basis of the indictment against Hare.

The scheme began to unravel when a bank employee reported to the Internal Revenue Service (IRS) a suspicious transaction involving Hare and Sermon. The IRS in turn notified the Federal Bureau of Investigation (FBI), and after investigating the matter, they discovered the scheme to defraud Riley. On October 14, 1992, an FBI agent and an IRS agent went to Hare's law office and showed him the evidence that they had gathered against him through their investigation. Hare said that he had been expecting them and showed them a written confession that he had already been preparing. Hare chose to accompany the agents to the United States Attorney's office for an interview with them and the Assistant United States Attorney (AUSA). During that interview, Hare admitted with remorse and without condition that he had participated in the scheme to defraud Riley.

After this interview, Hare continued to cooperate with the authorities in their ongoing investigation, with the exception of a period from October 27, 1992, through late November, when Hare submitted to inpatient treatment for his alcohol addiction. Hare's cooperation included making consensually monitored telephone calls, and he continued preparing his written statement detailing the scheme, complete with corroborating documents and records attached.

On December 15, 1992, now represented by an Assistant Federal Public Defender, Hare and his attorney met with the AUSA to discuss a possible plea bargain. Hare was presented with two options. He could plead guilty to two lesser counts and continue cooperating in exchange for the government's promise to make a U.S.S.G. § 5K1.1 motion at the time of sentencing for a downward departure for substantial assistance. If Hare chose not to cooperate, the government would charge more counts and would not make a motion for downward departure. Hare chose to continue cooperating. The AUSA offered a formal plea agreement at that time, but Hare's attorney said that a written agreement was not necessary. After December 15 and in conformity with the oral plea agreement, Hare continued to cooperate until December 29, 1992. On that date, Hare

---

1. The Honorable Joseph E. Stevens, Jr., Chief Judge, United States District Court for the Western District of Missouri.

was apprehended attempting to flee to Canada.

Because Hare terminated his cooperation under the plea agreement, he was subsequently charged by a grand jury indictment with six counts of wire fraud, in violation of 18 U.S.C. § 1343, three counts of money laundering, in violation of 18 U.S.C. § 1957, and criminal forfeiture, pursuant to 18 U.S.C. § 982. The district court denied Hare's motion to suppress which was based upon Federal Rule of Criminal Procedure 11 and Federal Rule of Evidence 410 and denied Hare's motion to dismiss the money laundering counts. A jury subsequently convicted Hare of four counts of wire fraud and all three counts of money laundering.

At sentencing, the district court adjusted Hare's base offense level upward two levels for Hare's knowledge that the funds were the proceeds of wire fraud. The district court also applied a two-level upward adjustment for obstruction of justice. The district court sentenced Hare to 46 months of imprisonment and fined him $5,250. Hare appeals.

## II.

■ Hare challenges the district court's denial of two pretrial motions: (1) a motion to suppress statements that Hare contends were made in the course of plea discussions, and (2) a motion to dismiss the money laundering counts. First, Hare contends that the district court erred in denying his motion to suppress all statements that he made while cooperating with law enforcement agents from October 14, 1992, through December 29, 1992. Hare argues that these statements were made in the course of plea negotiations and their use at trial therefore violated Rule

11 of the Federal Rules of Criminal Procedure[2] and Rule 410 of the Federal Rules of Evidence.[3]

We review for clear error a district court's decision to deny a motion to suppress. *See United States v. Lloyd,* 43 F.3d 1183, 1186 (8th Cir.1994); *United States v. Jorgensen,* 871 F.2d 725, 728 (8th Cir.1989). "Therefore, we must affirm unless the decision of the district court is unsupported by substantial evidence, based on an erroneous interpretation of applicable law, or, in light of the entire record, we are left with a firm and definite conviction that a mistake has been made." *Jorgensen,* 871 F.2d at 728. The magistrate judge's[4] report and recommendation in this case concluded that the statements at issue were not made in the course of plea negotiations and therefore were not subject to exclusion as statements made in the course of plea discussions. We agree.

■ "Federal Rule of Evidence 410 and Federal Rule of Criminal Procedure 11(e)(6) provide that statements made in the course of plea discussions between a criminal defendant and a prosecutor are inadmissible against the defendant." *United States v. Mezzanatto,* —— U.S. ——, ——, 115 S.Ct. 797, 799, 130 L.Ed.2d 697 (1995). "By [their] plain language, the rule[s] exclude[ ] only those statements which are made 'in the course of plea discussions.'" *Lloyd,* 43 F.3d at 1186 (quoting Fed.R.Crim.P. 11(e)(6)(D)). Statements voluntarily offered either before any plea negotiation has begun or after a plea agreement has been reached cannot be considered statements made "in the course of plea discussions" within the meaning of the exclusionary rules. *See id.* ("once a plea agreement has been reached, statements

---

**2.** Rule 11 provides in pertinent part that the following evidence is inadmissible in a criminal proceeding against a defendant who participated in plea discussions:

  (D) any statement made in the course of plea discussions with an attorney for the government which do not result in a plea of guilty or which result in a plea of guilty later withdrawn.

Fed.R.Crim.P. 11(e)(6)(D).

**3.** Rule 410 similarly provides in part that the following is inadmissible against a defendant who participated in plea discussions:

  (4) any statement made in the course of plea discussions with an attorney for the prosecuting authority which do not result in a plea of guilty or which result in a plea of guilty later withdrawn.

Fed.R.Evid. 410.

**4.** The Honorable John T. Maughmer, Chief United States Magistrate Judge for the Western District of Missouri.

made thereafter are not entitled to [exclusion]"); *United States v. White*, 617 F.2d 1131, 1134 (5th Cir.1980) (statements made as mere "'cooperation' negotiations" were not subject to exclusion as plea discussions). To determine whether an accused's statements were made "in the course of plea discussions" within the meaning of Rule 11(e)(6)(D) and Rule 410, we must look to the specific facts of each case and examine "the totality of the surrounding circumstances." *Lloyd*, 43 F.3d at 1186 (citing *United States v. Grant*, 622 F.2d 308, 312 (8th Cir.1980)).

In this case, Hare sought to suppress statements made on October 14, 1992, when he met with the agents and the AUSA. Hare admitted to the agents that he was expecting them, and he showed them the written confession that he had begun drafting. The agents were not authorized to engage in plea discussions and did not do so. Hare consented to meet the AUSA later the same day. The AUSA testified at the suppression hearing that Hare was very remorseful. The AUSA acknowledged that he and Hare had discussed the Sentencing Guidelines somewhat, but said they had done so only in general terms and not for the purpose of negotiating a plea. At Hare's inquiry, the AUSA informed him that the Guidelines would call for definite jail time, absent cooperation due to the amount of money involved. Specifically, the AUSA "told him that a 5K motion would reduce his exposure under the guidelines" but further testified that they "did not discuss [the] specifics of where the guidelines came out." (Hearing Tr., Apr. 27, 1993, at 90.) The AUSA did not discuss specific charges with Hare and did not offer any plea bargain.

The circumstances surrounding the October 14 interviews indicate to us that Hare was anxious to cooperate yet naturally concerned about the consequences of his wrongdoing. Hare was an attorney familiar with the Guidelines and aware that the offenses with which he could be charged were serious. His statements were offered unconditionally in an effort to cooperate. Perhaps Hare was hopeful of improving his situation and eventually gaining a motion for substantial assistance at sentencing, but the statements can-

not be said to have been made in the course of plea discussions within the meaning of the exclusionary rules because no plea bargain was offered or even contemplated at that point.

The same is true for statements made during Hare's continued cooperation after October 14, 1992, with one exception. The government entered into plea discussions with Hare on December 15, 1992, and at that time, Hare accepted an offer which required him to continue cooperating with the government. Any statements made during this discussion would be entitled to the exclusionary protection of Rule 11(e)(6)(D) and Rule 410, but it appears that no statements from that meeting are at issue. Rather, Hare sought to suppress subsequent statements made and evidence provided while he was cooperating pursuant to that agreement. Statements made after the agreement had been reached, however, cannot be said to have been made in the course of plea discussions. *See Lloyd*, 43 F.3d at 1186. We conclude that the district court did not clearly err by denying Hare's motion to suppress.

■ Second, Hare contends that the district court erred in denying his motion to dismiss the money laundering counts. Hare argues that the money laundering statute requires the money to have been derived from "specified unlawful activity" within the meaning of the statute and that this phrase does not include the offense of wire fraud with which he was charged. We disagree.

The money laundering statute prohibits anyone from knowingly engaging "in a monetary transaction in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity." 18 U.S.C. § 1957(a). Section 1957(f)(3) provides that "specified unlawful activity" is defined in 18 U.S.C. § 1956. Section 1956(c)(7) in turn defines "specified unlawful activity" in five different ways in subsections (A) through (E).

Hare argues that wire fraud is no longer within the contemplation of subsection (D) of section 1956(c)(7) because a recent amendment omitted that offense, which previously had been specified therein. Hare's argument misses the mark. Whether an amendment

removed wire fraud from the scope of subsection (D) is inapposite to our resolution of this case because we conclude that wire fraud is within the scope of subsection (A) of section 1956(c)(7).

Subsection (A) defines "specified unlawful activity" as "any act or activity constituting an offense listed in section 1961(1) of this title." 18 U.S.C. § 1956(c)(7)(A). Section 1961(1) provides a list of crimes that can be considered "racketeering activity" under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968. Wire fraud is specifically listed in section 1961(1)(B) as a RICO predicate offense; therefore, wire fraud is a "specified unlawful activity" within the meaning of the money laundering statute, 18 U.S.C. § 1957(a), as defined in subsection (A) of section 1956(c)(7). We find no ambiguity in this language. *See United States v. Taylor,* 984 F.2d 298, 301 (9th Cir.1993) ("plain language of the statute compels the conclusion that section 1961(1)'s offenses are incorporated into section 1956(c)(7)" and "[n]othing in section 1956(c)(7) limits the incorporation of section 1961(1) offenses to those rising to the level of a RICO violation"). Thus, the district court did not err in denying Hare's motion to dismiss the money laundering counts.

### III.

Hare also challenges two upward adjustments to his base offense level under the Sentencing Guidelines. The district court applied a two-level increase for a specific offense characteristic pursuant to United States Sentencing Commission, *Guidelines Manual,* § 2S1.2(b) (Nov. 1993) (U.S.S.G.), and a two-level increase for obstruction of justice pursuant to U.S.S.G. § 3C1.1. We examine each in turn.

The base offense level for money laundering under the Guidelines is 17. *See* U.S.S.G. § 2S1.2(a). A district court must increase this by two levels "[i]f the defendant knew the funds were the proceeds of . . . [a] specified unlawful activity (*see* 18 U.S.C. § 1956(c)(7))." U.S.S.G. § 2S1.2(b)(1)(B). The district court applied this specific offense characteristic enhancement to Hare's base

offense level because of his knowledge that the funds were the proceeds of wire fraud. "Whether the district court properly applied section 2S1.2(b)(1)(B) is a mixed question of law and fact that we review de novo," and we review the underlying factual findings for clear error. *Taylor,* 984 F.2d at 300.

Hare renews his contention that wire fraud is not a "specified unlawful activity" within the meaning of the statute, and he argues that he therefore could have had no "knowledge" that it was. Because we concluded above that wire fraud is a "specified unlawful activity" within the meaning of the statute, we reject this argument without further comment. *See id.* at 301 ("Because section 1961(1)'s offenses, as incorporated into section 1956(c)(7), include the offense of wire fraud, the district court properly increased [the defendant's] base offense level based on wire fraud.").

■ Hare also argues that this two-level upward adjustment amounts to impermissible double counting because it increases the offense level for conduct that is already inherent in the base offense level. We disagree. "The 2–level increase in subsection [2S1.2](b)(1)(B) applies if the defendant knew that the funds were not merely criminally derived, but were in fact the proceeds of a specified unlawful activity." U.S.S.G. § 2S1.2, comment. (backg'd.). "Knowledge that the property is from a specified unlawful activity is not an element of [this money laundering statute]." *Id.* In fact, the money laundering statute at issue (18 U.S.C. § 1957) expressly states that "the Government is *not* required to prove the defendant knew that the offense from which the criminally derived property was derived was specified unlawful activity." 18 U.S.C. § 1957(c) (emphasis added). *See also United States v. Lombardi,* 5 F.3d 568, 570 n. 3 (1st Cir.1993) (under § 1957, the money launderer must know that the proceeds are derived from criminal activity but not that the activity is a specified unlawful activity named in the statutes). Thus, because this specific offense characteristic enhancement applies to conduct that is not an element of the offense, it does not amount to impermissible double counting.

Hare was one of the persons directly involved in committing the wire fraud, so it is beyond question that he knew that the laundered funds were obtained through wire fraud. We therefore conclude that the district court did not err in applying this two-level upward adjustment.

■ Hare's final contention is that the district court erred by adjusting his offense level upward for obstruction of justice. The obstruction of justice guideline provides for a two-level upward adjustment "[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense." U.S.S.G. § 3C1.1. The district court applied the obstruction of justice enhancement, finding that Hare had agreed to cooperate in the investigation but then fled to Canada, that he told another target of the investigation that the FBI would be coming, and that he took with him some of the criminally derived funds. Hare contends that the district court's factual findings are clearly erroneous because his trip to Canada was not for the purpose of flight but to seek new legal representation.

"We review de novo a sentencing court's determination that section 3C1.1 applies to specific conduct, but we review for clear error the court's factual findings." *United States v. McCoy,* 36 F.3d 740, 742 (8th Cir. 1994). The record is clear that Hare went to Canada on December 29, 1992, with a substantial amount of money and that before he left he called Weller, who was also a target of the investigation, and told him that the FBI would be coming to see him soon. Having carefully reviewed the record, we conclude that the district court's findings of fact are not clearly erroneous.

Hare also argues that his conduct did not warrant an enhancement for obstruction of justice, according to the Guideline's commentary. The commentary to section 3C1.1 provides a nonexhaustive list of the type of conduct that, standing alone, will not warrant an increase for obstruction of justice. Included in this list is the conduct of "avoiding or fleeing from arrest." U.S.S.G. § 3C1.1, comment. (n. 4(d)). An obstruction of justice

enhancement is not warranted when flight occurs immediately after a crime and is "a natural attempt to avoid apprehension." *United States v. Stroud,* 893 F.2d 504, 507–08 (2nd Cir.1990). This type of "pre-investigation" conduct generally occurs without knowledge that an investigation is underway, and it does not warrant enhancement because it is more of an initial instinctive reaction than willful obstruction of justice. *See United States v. Oppedahl,* 998 F.2d 584, 586 & n. 3 (8th Cir.1993).

In this case, Hare's "trip" to Canada was a willful breach of his agreement to cooperate in the investigation and not an instinctive pre-arrest flight. Hare had been cooperating with officials and had agreed to further cooperate in the investigation as part of his plea bargain. We are satisfied that Hare's flight to Canada at a time when he was supposedly cooperating pursuant to a cooperation plea bargain agreement warrants an enhancement for obstruction of justice. *See United States v. Shinder,* 8 F.3d 633, 635 (8th Cir.1993) (defendant's flight to California after conviction and prior to sentencing was sufficient to justify obstruction of justice enhancement). Additional factors such as Hare's phone call alerting Weller to the FBI investigation and the funds with which Hare left the country make this an even more compelling case in which to apply the enhancement. We conclude that the district court did not err in applying a two-level sentencing enhancement for obstruction of justice.

### IV.

In summary, the district court did not err in denying Hare's pretrial motions to suppress and to dismiss. We also find no error in the district court's application of sentencing enhancements under the Guidelines. Accordingly, we affirm the judgment of the district court.