**UNITED STATES of America, Appellee,**

v.

**El Tora GRAHAM, Appellant.**

Nos. 93–3159, 95–3060.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 17, 1996.

Decided Aug. 9, 1996.

Rehearing Denied Oct. 9, 1996.

Joseph F. Yenouskas, Washington, DC, argued the cause and filed the briefs, for appellant.

Ann M. Carroll, Assistant United States Attorney, Washington, DC, argued the cause for appellee, with whom Eric H. Holder, Jr., United States Attorney, John R. Fisher, Thomas J. Tourish, Jr., and Lynn C. Leibovitz, Assistant United States Attorneys, were on the brief. Elizabeth Trosman, Assistant United States Attorney, entered an appearance.

Before: WILLIAMS, GINSBURG and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

A jury convicted El Tora Graham on six counts of a seven-count indictment charging a variety of drug trafficking offenses, and the district court imposed a life sentence as required by the United States Sentencing Guidelines. On appeal Graham claims that the district court improperly denied his three pretrial motions for appointment of substitute counsel and, relatedly, that he received ineffective assistance of counsel during pretrial negotiations and at sentencing, in violation of the Sixth Amendment to the United States Constitution. Graham also claims that the Government failed to prove at trial the same conspiracy alleged in the indictment. We affirm Graham's conviction and sentence against all such claims.

## I. Background

In the course of investigating several violent crimes committed on two blocks of Newton Street in Northwest Washington, the Metropolitan Police Department learned of a drug trafficking organization known as the "Newton Street Crew," headed by Mark "Markie" Hoyle and John McCullough. The efforts of the MPD and of the Federal Bureau of Investigation lead to the indictment of twenty-three alleged Crew members.

In one indictment the grand jury charged El Tora Graham and three co-defendants with a variety of offenses related to the distribution of cocaine base (a/k/a crack cocaine). The Government engaged in plea negotiations with all four defendants, and all but Graham pleaded guilty. Graham stood trial on one count of conspiring to distribute 50 grams or more of crack cocaine, in violation of 21 U.S.C. § 846; three counts of distributing five or more grams of crack, in violation of 21 U.S.C. § 841(a)(1) & (b)(1)(B)(iii); and three counts of using a telephone to facilitate cocaine distribution, in violation of 21 U.S.C. § 843(b). Convicted by a jury on each charge save one of the telephone counts, Graham was sentenced to concurrent terms of life imprisonment on the conspiracy count and each of the distribution counts, and to concurrent eight-year terms on each of the two telephone counts.

Graham filed a timely notice of appeal and a motion to vacate his sentence per 28 U.S.C. § 2255, claiming that he received ineffective assistance of counsel at sentencing. Graham subsequently added a claim of ineffective as-

sistance during plea negotiations. After a two-day hearing, the district court rejected both claims of ineffective assistance and denied Graham's § 2255 motion. Graham's appeal from that order is consolidated here with his direct appeal.

## A. Pretrial Plea Negotiations

Graham was arrested in July 1992. In August he attended a meeting with defense counsel Robert Werdig, Detective Sergeant Daniel Wagner of the MPD, and FBI Special Agent Mark Giuliano. The purpose of this meeting, according to Wagner's testimony at the hearing on Graham's § 2255 motion, was to explore the possibility of Graham's working out a plea offer and assisting the Government in the prosecution of other members of the Newton Street Crew, "most importantly, against what were considered the top members[,] that is Mark Hoyle and John McCullough, Mario Harris and that level." Wagner told Graham that he would "spend the rest of his life in jail" if he did not cooperate. Agent Giuliano also told Graham that he faced a life sentence. Graham's lawyer, who had been present when Wagner warned Graham that he could spend the rest of his life in jail, told the defendant, in the presence of Wagner and Giuliano, "that he, indeed, should listen to [them] and pay attention to what [they] had to say."

According to Sergeant Wagner, Graham said that he wanted to cooperate because "he couldn't do that kind of time in jail," but then gave only information "that actually was fairly common knowledge, and it was not about the Newton Street Crew." Wagner warned him that "he was going to have to think harder, because while we knew that he was going to have to talk about his friends and people that he was afraid of, that was fair ... [and] he was going to have to if he expected to be credited with any kind of cooperation." The meeting ended with Graham insisting that he had told all he knew.

About two weeks later, Graham attended another meeting with the same three people plus Assistant United States Attorney (AUSA) Paul Howes, who also told Graham that he faced life imprisonment if he did not cooperate. Again Graham claimed that he was willing to cooperate, but again, according to Wagner, when the meeting ended Graham had offered "nothing substantial at all."

In April 1993 AUSA Lynn Leibovitz made Graham a plea offer in a telephone conversation with his attorney, Werdig. At the § 2255 hearing she testified that the cooperation she sought from Graham in exchange

> was not specifically limited to Newton Street. Its was broad-based cooperation and truthful testimony in whatever other— at trial or whatever other proceedings we would ask him about.

Graham did not accept.

A third meeting took place the next month, shortly before Graham's trial was scheduled to start. All the dramatis personae were present: Graham, Wagner and Giuliano, and the lawyers Leibovitz, Howes, and Werdig. Two members of the Newton Street Crew, Donnie Strothers and William "Toby" Hoyle, had just been convicted. Howes told Graham that this was his last chance to cooperate in the prosecution of Mark Hoyle "and the other senior defendants" in the Newton Street cases; the Government would negotiate no further and Graham would spend the rest of his life in jail. Howes asked Graham why he would "do life for Markie Hoyle." Although the Government went so far as to bring in other cooperating defendants, who told Graham that they intended to testify against him and encouraged him to accept the Government's offer, Graham said that he would take his chances in court.

During these three meetings, Wagner and Giuliano had explained to Graham that he would surely get a life sentence if convicted on the conspiracy charge because of the way in which crimes committed by his co-conspirators would affect the calculation of his sentence, and that the sentence would be mandatory under the Sentencing Guidelines unless the Government asked the court to depart downward. Throughout the course of the meetings Graham never expressed any doubt that he would face life imprisonment if he went to trial and was convicted; indeed, at the first two meetings he said that he would cooperate in order to avoid this fate.

## B. Motions for Appointment of Substitute Counsel

Between the second and third plea negotiation meetings recounted above, Graham made three written requests for appointment of substitute counsel. In his first letter to the district judge (February 1993), Graham charged that his attorney (still Werdig) "doesn't show any type of professional ethics that may be sufficient in my case," "[has] a lack of confidence in his [sic] self," and "seems to always try to push me in the other directions." Graham asked the judge to appoint counsel who would "work with me and not against me."

In a second request letter to the district court (undated), Graham said that he was "still dissatisfied" with his attorney's performance. He charged that Werdig lacked interest in his case and had not been to see him in jail for nine months. Finally (in April 1993) Graham sent a third letter, in which he charged that Werdig was not working in Graham's best interest, had still not visited him in jail, had provided him with no information regarding the progress of his case, and had performed none of the investigative work that Graham had requested and believed "vital" to his case. Graham also said that he had never succeeded in reaching Werdig by phone, and that "with no communication there is absolutely no chance to build a defense to fight my case." After receiving the third letter, the district court scheduled a hearing, at which the court denied Graham's request for new counsel without giving him an opportunity to speak.

## C. Negotiation for Sentence Reduction

After the district court sentenced Graham to life imprisonment and the defendant had filed a timely notice of appeal, this court appointed Joseph Yenouskas to serve as appellate counsel. Sometime around March 1994—several weeks before the trial of Newton Street Crew leader Mark Hoyle—Yenouskas contacted AUSA Leibovitz to determine whether the Government was interested in obtaining Graham's cooperation in exchange for a Government motion to reduce his sentence under Federal Rule of Criminal Procedure 35(b) (district court may upon Government's motion reduce sentence based upon defendant's having provided "substantial assistance in the investigation or prosecution of another person who has committed an offense").

At the later hearing on Graham's § 2255 motion, Leibovitz testified that she told Yenouskas that the Government would be interested in testimony concerning the drug trafficking activities and acts of violence, "including possibly murders," committed by Mark Hoyle, Mario Harris, and other members of the Newton Street Crew, but could offer no guarantee regarding whether or to what extent Graham's sentence would be reduced until Graham had provided the "substantial assistance" necessary to support a Rule 35(b) motion. She testified that in a subsequent conversation Yenouskas told her that Graham would not cooperate without such a guarantee.

## II. Analysis

■ Graham's claims of ineffective assistance are intertwined with his claim that we must vacate his conviction because the district court improperly denied his motions for appointment of substitute counsel. Although Graham disputes the point vigorously, an indigent defendant who seeks court-appointed representation has no constitutional right to the counsel of his choice; he has only the right to effective representation. Unless he can establish an ineffective assistance claim under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), therefore, any error in the district court's disposition of Graham's motion for appointment of substitute counsel is harmless.

We turn first to Graham's claims of ineffective assistance during the pretrial plea negotiations, then at sentencing; he has not claimed that Werdig rendered ineffective assistance during trial. We next address Graham's objection to the manner in which the district court disposed of his motion for appointment of substitute counsel, taking the opportunity to clarify the district court's obligation to investigate the facts underlying such a motion.

## A. Assistance of Counsel During Pretrial Plea Negotiations

■ The Government does not dispute that a defendant's constitutional right to effective assistance of counsel attaches during plea negotiations, and that during the pretrial plea negotiations in this case counsel failed to inform Graham that he faced a mandatory life sentence if convicted at trial. Further, the Government concedes that in this respect counsel's performance fell below "the range of competence demanded of attorneys in criminal cases," thereby making out the first element of an ineffective assistance claim under *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064. *See United States v. Blaylock,* 20 F.3d 1458, 1465 (9th Cir.1994); *Lewandowski v. Makel,* 949 F.2d 884 (6th Cir.1991); *Beckham v. Wainwright,* 639 F.2d 262 (5th Cir.1981). The Government contends, however, that Graham cannot make out the second element of such a claim—"a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068—because, as the district court found, even if his attorney had adequately informed him of his sentencing exposure, he would have gone to trial rather than accept any plea offer the Government was willing to make. *See Blaylock,* 20 F.3d at 1466.

Based upon the testimony of AUSA Leibovitz, the district court found that even after he had been sentenced to life imprisonment Graham rejected the Government's offer of a possible sentence reduction under Rule 35(b) in exchange for his cooperation because the Government would not offer a guaranteed deal prior to obtaining that cooperation. That finding is sufficient to support the court's ultimate conclusion that Graham would have rejected the Government's plea offer despite correct advice from counsel regarding his maximum sentencing exposure, for the record indicates that every plea offer the Government made was conditioned upon the sufficiency of Graham's cooperation. Graham argues, however, that the district judge erred by admitting Leibovitz' testimony on this subject, and erred again when he threatened to disqualify Yenouskas from further representing Graham if Yenouskas took the stand to rebut Leibovitz' testimony regarding their conversations.

■ Graham's theory is that Leibovitz' testimony should have been excluded from the § 2255 hearing under Federal Rules of Evidence 408 and 410 because it concerns "settlement discussions," specifically, the possibility of a Rule 35(b) sentence reduction for the purpose of "resolving" Graham's pending appeal and § 2255 motion. Rule 408 provides that

> Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible....

The subject of this rule is the admissibility of evidence (in a civil or criminal case) of negotiations undertaken to "compromise a claim" in a civil action, *see* Jack B. Weinstein et al., 2 *Weinstein's Evidence* ¶ 408[01] at 408–17 & n.28 (citing cases) (1992); it does not address the admissibility of evidence concerning negotiations to "compromise" a criminal case. *See United States v. Baker,* 926 F.2d 179, 180 (2d Cir.1991) ("Negotiations over immunity from criminal charges or a plea bargain do not in ordinary parlance constitute discussions of a 'claim' over which there is a dispute as to 'validity' or 'amount'"); *see also* Charles Alan Wright and Kenneth W. Graham, 23 *Federal Practice and Procedure* § 5306 at 216–219 (1980) ("It seems odd to refer to the prosecution's case against a criminal defendant as a 'claim'.... The arguments [in favor of doing so] are not convincing"). Moreover, as the court pointed out in *Baker,* "[t]he very existence of Federal Rule of Criminal Procedure 11(e)(6) [and of Rule 410] strongly support[ ] the conclusion that Rule 408 applies only to civil matters." 926 F.2d at 180. *But see United States v. Greene,* 995 F.2d 793, 798 (8th Cir.1993), citing *United States v. Verdoorn,* 528 F.2d 103, 107 (8th Cir.1976) ("Under the rationale

of Fed.R.Evid. 408, which relates to the general admissibility of compromises and offers to compromise, government proposals concerning pleas should be excludable").

In the context of a criminal case, Rule 410 (rather than Rule 408) strikes the balance between the interest in admitting all relevant evidence, *see* Rule 402, and the interest in resolving disputes without litigation. And Rule 410, like Criminal Procedure Rule 11(e)(6), applies only to "plea" negotiations, not to every offer of cooperation, *United States v. Hare,* 49 F.3d 447, 450–51 (8th Cir.1995); *United States v. Leon Guerrero,* 847 F.2d 1363, 1367 (9th Cir.1988), and certainly not to post-conviction bargaining. This limitation apparently reflects the drafters' quite plausible policy judgment that, in general, the social benefits of post-conviction bargaining are less than the benefits of plea bargaining and the settlement of civil disputes, *i.e.,* that encouraging post-conviction bargaining does not warrant compromising the fact-finding process by excluding relevant evidence.

At the time of Leibovitz' conversations with Yenouskas, Graham had been convicted and sentenced to life imprisonment without possibility of parole. The Government did not need, and Graham was not offering, a guilty plea. Therefore, Rule 410 is inapplicable and Graham's argument beside the point.

Next, Graham argues that the district court imposed upon him a "substantial hardship" by ruling that it would disqualify Yenouskas from further representing Graham if the attorney took the stand to rebut Leibovitz' testimony. We do not see the hardship. Yenouskas had been accompanied by a colleague, William Sheehan, on the motions and briefs filed in the district court. Although the district judge ruled that lead counsel could not testify and continue to represent Graham, the judge said that he would proceed with Sheehan representing Graham. Yenouskas argued that his colleague was less familiar than was he with Graham's case, but the record contains no indication that the district judge could not or would not have cured this problem by granting Sheehan's request for a continuance, if made and needed.

In any case, based upon the testimonial proffer that Yenouskas submitted, it is clear that there was no harm done by the exclusion of his testimony. Graham claims that the attorney's proffer and his own testimony, taken together, establish that the Government's interests changed, to his detriment, between the pretrial plea negotiations and the post-sentencing Rule 35 discussions. In particular, Graham says that "the government's primary interest . . . [had changed to] a subject that Graham knew nothing about," rendering Graham's formerly valuable information worthless and leaving him with nothing else to trade. In fact, however, Yenouskas' testimony would not have shown this and would have been in some tension with Graham's testimony.

Graham testified that he believed the Government wanted testimony concerning murders committed by Mark Hoyle in exchange for a Rule 35(b) motion and that he had no such information. Yenouskas would have testified that Leibovitz told him she was no longer interested in testimony concerning Markie Hoyle, but was primarily interested in testimony about murders committed by Mario Harris. Graham points to nothing in the record—not even his own testimony—to suggest that he could not have substantially assisted the Government in prosecuting Mario Harris.

Yenouskas would have denied telling Leibovitz that Graham would not cooperate without a guaranteed sentence. If the district judge had admitted and credited this testimony, however, that would simply leave unexplained Graham's refusal to cooperate despite the Government's offer of a potentially substantial sentence reduction. The fact of Graham's refusal to cooperate after he had received a life sentence would remain, and that refusal speaks louder than the reason he refused—unless Graham can establish a reason that he did not have during plea negotiations. As noted in the prior paragraph, however, his one attempt to establish such a reason falls short.

In sum, Leibovitz' testimony provided a proper and sufficient basis for the district court's finding that Graham would not have

pleaded guilty regardless of the advice he might have received had Werdig's representation of Graham not been deficient. His claim of ineffective assistance of counsel fails, therefore, for want of the showing of prejudice required under *Strickland.*

### B. Assistance of Counsel at Sentencing

■ Graham also argues that Werdig's preparation for sentencing was inadequate and that counsel negligently failed to dispute several recommendations in the Presentence Report (PSR) received and adopted by the district court. As Graham concedes, in order to prevail on these claims he must show that counsel's performance was so deficient as to "undermine confidence in the outcome" of the proceeding. *United States v. Saro,* 24 F.3d 283, 287 (D.C.Cir.1994). The Government, of course, argues that defense counsel made no such significant error. We address in turn each of the sentencing recommendations in the PSR that Graham says his lawyer should have but did not challenge.

■ *1. Quantity of Drugs.* The PSR recommended a base offense level of 40 on the ground that Graham had distributed at least five kilograms of crack cocaine. Graham says that counsel should have challenged the factual predicate, but there is no apparent reason why he should have. The supporting evidence includes undisputed testimony that Mark Hoyle gave Graham an eighth of a kilogram per week for at least the first 26 weeks of 1992 (.125 kg × 26 = 3.25 kg) and that another supplier, one Adolph, supplied Graham with a quarter of a kilogram every other week during the same period (.25 kg × 13 = 3.25 kg) for a total of 6.5 kilograms.

■ *2. Manager/Supervisor Status.* The PSR recommended a three-point increase in Graham's offense level, pursuant to USSG § 3B1.1, to reflect his status as a "manager or supervisor" of the conspiracy. Graham argues that counsel also should have "challenged the factual basis" for this enhancement. Werdig did not challenge the accuracy of the facts recounted in the PSR, and with good reason, for they are amply supported in the record. He did, however, challenge the legal sufficiency of the evidence

in the record to establish that Graham had been a manager or supervisor within the meaning of the Sentencing Guidelines. On this point, therefore, Graham cannot satisfy even the first element of an ineffective assistance claim—deficient performance.

■ *3. Wrong Criminal History Category.* Graham argues that defense counsel failed to challenge the erroneous recommendation in the PSR that he be assigned a criminal history category of III. He argues also that defense counsel should have asked for a downward departure because Graham's criminal history category "over-represents" the seriousness of his criminal background. No argument based upon Graham's criminal history category could have helped him, however, because an offense level of 43 (calculated from his base offense level of 40 plus 3 points for being a manager or supervisor) requires a mandatory life sentence regardless of the defendant's criminal history category.

■ *4. Proportionality.* Finally, Graham faults defense counsel for not having argued that the district court should depart downward from the life sentence required by the Guidelines because Graham's criminal activity was less serious than that of other miscreants in the Newton Street Crew who would likely receive the same sentence. Mandatory life imprisonment, however, is the highest penalty imposed by the Guidelines. Inevitably, therefore, it will be imposed upon defendants the seriousness of whose criminal activity varies, perhaps substantially. That a defendant whose crimes were more serious also received a mandatory life sentence can never, therefore, justify a downward departure from a life sentence mandated by the Guidelines.

### C. Motions for Appointment of Substitute Counsel

■ Graham argues that the district court's denial of his motions for appointment of substitute counsel deprived him of his right to counsel of choice under the Sixth Amendment. That right could not have been violated, however, because Graham was asking the district court to replace one appoint-

ed attorney with another and never either expressed a desire to retain counsel or represented that he had the means to do so. "One of the express limitations upon the right to choose one's own attorney is that the criminal defendant be 'financially able' to retain counsel of his choice." *United States v. Friedman,* 849 F.2d 1488, 1490 (D.C.Cir. 1988). *See also United States v. Childress,* 58 F.3d 693, 736 (D.C.Cir.1995) (defendant "has no constitutional right to *appointed* counsel of his choice") (original emphasis).

 Still, a defendant does have the right to effective representation by appointed counsel, and this right may be endangered if the attorney-client relationship is bad enough. *Smith v. Lockhart,* 923 F.2d 1314, 1320 (8th Cir.1991) (defendant seeking appointment of substitute counsel has burden of showing good cause, "such as a conflict of interest, an irreconcilable conflict, or a complete breakdown in communication"); *United States v. Iles,* 906 F.2d 1122, 1130 (6th Cir. 1990) (*accord*).

 A district court's denial of a motion for substitute counsel is reviewed only for abuse of discretion, *United States v. Zillges,* 978 F.2d 369, 371 (7th Cir.1992). When an indigent defendant seeks appointment of substitute counsel pro se, however, the district court generally has an obligation to engage the defendant in a colloquy concerning the cause of the defendant's dissatisfaction with his representation. *Iles,* 906 F.2d at 1130 ("trial court clearly has a responsibility to determine the reasons for the defendant's dissatisfaction with his current counsel," dictum quoting LaFave and Isreal, *Criminal Procedure,* § 11.4 at 36 (1984)); *Zillges,* 978 F.2d at 372 (court must inquire into specific basis of defendant's dissatisfaction with counsel unless reason is clear on face of motion); *McMahon v. Fulcomer,* 821 F.2d 934, 942 (3d Cir.1987) (reversing denial of habeas relief on ground that trial court did not inquire into reason for defendant's dissatisfaction with counsel). This colloquy, which should be conducted on the record, *Smith v. Lockhart,* 923 F.2d 1314, 1320 (8th Cir.1991), may not only help the pro se defendant adequately to express the reason for his dissatisfaction with counsel, thereby promoting confidence in the integrity of the process and in the jury's verdict, *see Iles,* 906 F.2d at 1131; it also creates an opportunity for the court to ease the defendant's concern if it is ill-founded, *Lockhart,* 923 F.2d at 1320.

 The manner in which the district court disposed of Graham's motions shows little regard for the values at stake when a defendant in good faith believes that he is entitled to substitute counsel but has not articulated a legally sufficient ground for substitution. As the Government admits, Graham's first letter amounted to a "vague expression of dissatisfaction." Indeed, each of Graham's three letters contains sufficiently vague allegations that the court should have engaged Graham with regard to the underlying facts. *United States v. Morrison,* 946 F.2d 484, 499 (7th Cir.1991) (unless substitution motion is "extremely detailed" district judge cannot evaluate attorney-client relationship without conducting "a proper hearing at which both attorney and client testify as to the nature of their conflict").

In this case, the district judge held a brief hearing at which Graham was given no opportunity to speak. Indeed, the judge began the hearing by stating that "in the last analysis" it was up to defense counsel to determine "whether or not your relationship with [the defendant] is so badly impaired that you can't continue with the case." Based upon Graham's letters and defense counsel's representation that he did not think Graham "could find other counsel in this jurisdiction that would represent him any better than I can," the court ruled that Graham had "not made a sufficient showing" to warrant appointment of a new lawyer.

As the constitutional right to choice of counsel does not apply, however, Graham must show not only that the district court improperly disposed of his motions for substitute counsel, but also that the error was prejudicial to his case:

[I]f a defendant is [ ] afforded effective representation, an erroneous denial of a substitution motion is not prejudicial.... [I]n order to establish prejudice, [the defendant] must demonstrate that the performance of his attorney was not "within the

range of competence demanded of attorneys in criminal cases," and that "but for" counsel's deficiencies, "the result of the proceeding would have been different."

*Zillges,* 978 F.2d at 372–73, quoting *Strickland,* 466 U.S. at 687, 694, 104 S.Ct. at 2064, 2068; *see also Brown v. United States,* 264 F.2d 363, 366 (D.C.Cir.1959) (en banc) (dictum that court would not reverse conviction of defendant whose right to dismiss counsel and proceed pro se had been wrongfully denied if defendant received effective representation and thus suffered no prejudice).

Graham does not argue that he received ineffective assistance of counsel at trial and, as we have seen, his claims of ineffective assistance during plea negotiations and at sentencing come up short. His claim to substitute counsel must fall with his claims to have received ineffective assistance from his court-appointed lawyer.

### III. Conclusion

Graham raises one additional claim—of a variance between the conspiracy charged in the indictment and the Government's proof at trial—that does not warrant treatment in a published opinion. Whatever variance there may have been caused Graham no "substantial prejudice" at trial. *See United States v. Tarantino,* 846 F.2d 1384, 1391 (D.C.Cir.1988).

Having failed to establish his claims of ineffective assistance on either side of a trial about which he offers only one insubstantial complaint, Graham must live with both the verdict and the sentence. For the reasons set forth above, the judgment of the district court is

*Affirmed.*