ORDER AMENDING OPINION AND DISSENT AND AMENDED OPINION AND AMENDED DISSENT BETTY B. FLETCHER, Circuit Judge.
ORDER
The majority opinion and the dissenting opinion filed October 18, 2005, slip op. 14223, appearing at 426 F.3d 1095 (9th Cir.2005), are hereby amended. The amended opinion and amended dissent are filed concurrently herewith. The opinion and dissent are amended as follows:
1. Addition of footnote to 426 F.3d at 1107, end of paragraph 2:
Recently, in United States v. Gonzalez-Lopez, -U.S. -, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006), the Supreme Court reaffirmed that the Sixth Amendment guarantees not only the right to legal counsel, but also the distinct right of a criminal defendant to be represented by his attorney of choice. Writing for the majority, Justice Scalia further held that “erroneous deprivation of the right to counsel of choice” is structural error requiring the reversal of a subsequent conviction. Id. at 2564. The Court also explicitly noted that the right to counsel of choice “does not extend” to cases in which defendants “require counsel to be appointed for them.” Id. at 2565.
Plumlee’s claim is different. He was deprived entirely of legal counsel. The deprivation he suffered is different in kind and even greater than that suffered by Gonzalez-Lopez. To be sure, Plumlee claims that he did not want to be represented by his particular attorney. But the constitutional violation was not that he was denied “the right to counsel of[his] choice.” Id. at 2562. Instead, it was that the justifiable distrust of his attorney became so acute that Plumlee was denied his clearly established Sixth Amendment right to have an attorney “acting in the role of an advocate.” Anders, 386 U.S. at 743, 87 S.Ct. 1396.
(to the Dissent)
2. Addition of footnote to 426 F.3d at 1121, end of last full paragraph on the page:
The majority asserts that the Supreme Court’s recent decision in United States v. Gonzalez-Lopez, — U.S.-, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006) “reaffim[s] that the Sixth Amendment guarantees not only the right to legal counsel, but also the distinct right of a criminal defendant to be represented by his attorney of choice.” 426 F.3d at 1107 n. 8. The majority mis-characterizes the Gonzalezr-Lopez holding. Gonzalez-Lopez did not recognize the right of a criminal defendant to counsel “of his choice” anymore than it recognized the “right” of a shopper to goods “of his choice” in a shop — that is, unless the shopper pays for the goods or convinces the store-keeper to make them a present. The first paragraph of the majority’s footnote would be less liable to be quoted mischievously in the future, were the opinion to survive, if the words “of his choice” carry with them: “so long as he could arrange to pay such counsel, or have such *913 counsel agree to render services without expectation of payment.”
OPINION
Defendant-appellant Lary James Plum-lee (“Plumlee”), convicted of murder and armed robbery in Nevada state court in 1992, appeals the denial of his petition for a writ of habeas corpus under 28 U.S.C. § 2254. Plumlee claims that his Sixth Amendment right to counsel was violated by the trial judge’s denial of Plumlee’s pretrial motion to substitute counsel on the basis of an irreconcilable conflict that precluded Plumlee’s counsel from acting in the role of an advocate. At the time he moved the trial court to appoint alternate counsel, Plumlee reasonably and in good faith believed that members of the Washoe County Public Defender’s Office were leaking information about his case to another suspect in the case and to the District Attorney. The resulting distrust that arose between Plumlee and his appointed attorney was such that the attorney himself likened his representation of Plumlee to no representation at all. The judge declined to appoint new counsel. Given the circumstances of this unusual case, we conclude that the judge abused his discretion and that the Nevada Supreme Court’s contrary conclusion involved an unreasonable application of clearly established federal law. We therefore reverse.
I. BACKGROUND
In 1991, Plumlee was charged in Nevada state court with the armed robbery and murder of Wilbur Richard Beard. Over the course of Plumlee’s representation by the Washoe County Public Defender’s Office during 1991 and 1992, a series of incidents caused Plumlee to lose confidence in the attorneys of that office. Three such incidents stand out.
First, Chief Deputy Public Defender Shelly O’Neill was a good friend of John Dewey, who was both Plumlee’s roommate prior to his arrest and a suspect for the murder. Shortly after Plumlee’s arrest, Plumlee heard that O’Neill, who was the head trial attorney in the Public Defender’s Office, had been discussing Plumlee’s case with Dewey. Specifically, according to Plumlee’s sister, Dewey said that O’Neill had told him that Plumlee had implicated Dewey in the murder, and that O’Neill had suggested Dewey should seek legal counsel.
Second, David Allison, Plumlee’s first appointed counsel at the Public Defender’s Office, accepted a position with the District Attorney’s Office while representing Plum-lee. According to Plumlee, Allison lied to him about the fact that he would be taking the job. Prior to Allison’s departure for the District Attorney’s Office, Plumlee also suspected that Allison was leaking information to the District Attorney’s Office. Plumlee’s suspicions arose because he had told Allison about the potential evidentiary value of his car and evidence that might be in it, and shortly thereafter, the vehicle, then in police custody, was destroyed.
Third, Steven Gregory, Plumlee’s second appointed counsel at the Public Defender’s Office, denied the existence of a bail order for Plumlee. Plumlee claims that, when he insisted it existed, Gregory told him he needed psychiatric treatment. The next morning, the District Attorney produced a copy of the order.
Trial was originally set for July 20,1992. In a series of appearances and pleadings during late May and early June 1992, Plumlee moved the trial court to appoint independent defense counsel to represent him because the distrust between him and the Washoe County Public Defender’s Office had risen to the point that members of the office could not effectively represent him.
Gregory, who was representing Plumlee at the time of his motion to substitute *914 counsel, corroborated Plumlee’s assessment of their relationship and even made his own motion to be relieved as counsel.[1] In his affidavit accompanying Plumlee’s first motion to relieve counsel, Gregory attested that Plumlee distrusted the Public Defender’s Office and believed that members of the office had leaked information about his case. As a result, Gregory explained, Plumlee was “unable to establish an attorney/client relationship with me or any of my colleagues in the Public Defender’s Office” and was therefore “unable to properly assist counsel in his defense.” At the hearing on the first motion to relieve counsel, Gregory pleaded with the court to be relieved:
I must say, from my first dealings with Mr. Plumlee, I felt that there was an atmosphere of mistrust. I found it very difficult to establish a relationship with Mr. Plumlee because of the matters that had occurred prior to my even going to work at the Public Defender’s Office. Your Honor, in addition, I cannot think of a case where I have felt compelled to file a Motion To Be Relieved as a Nevada State Public Defender or as a Wash-oe County Public Defender. This is unique ....
[C]ertainly the failure to properly communicate with counsel or to have confidence or trust in him deters [counsel’s] effectiveness. And that’s, in reality, the situation we have here.
[B]ecause of Mr. Plumlee’s mistrust with the Public Defender’s Office and anyone attached to the Public Defender’s Office, he is unable to properly assist me, therefore, making my efforts less than effective.[2]
After hearing from both Plumlee and Gregory about the lack of trust between them, Judge Lane, the trial judge, denied the various motions to relieve the Washoe County Public Defender’s Office and have new counsel appointed. The judge told Plumlee: “Now let me tell you what you are not going to get. You are not going to get this Court to appoint some private lawyer, so that is out.” After Judge Lane made clear for the final time that he would not appoint substitute counsel, Plumlee moved to represent himself. Judge Lane granted Plumlee’s motion and appointed Gregory and the Public Defender’s Office to act as standby counsel. Gregory responded:
Your honor, we will make a motion at this time to be relieved. It’s obvious that the reason Mr. Plumlee wants to represent himself is he doesn’t trust the Public Defender’s Office. To order us to be stand-by counsel, in effect, gives him no stand-by counsel, and I would *915 urge the Court to appoint some other counsel to represent him.
The main reason this man wants to go pro per is because he doesn’t trust us and, frankly, Judge, I don’t trust the relationship that I have with Mr. Plum-lee....
I am going to beg the Court to appoint outside counsel to act as legal advisor for Mr. Plumlee.
Judge Lane denied the motion.
Judge Lane held an additional hearing to ensure the voluntariness of Plumlee’s decision to opt for self-representation. When asked whether he wanted to represent himself, Plumlee replied: “I don’t have a choice, Your Honor.” The judge responded: ‘You have a choice. The choice you don’t have, unless I am ordered otherwise by the Supreme Court, you do not have the choice of this Court appointing somebody other than the Public Defender.” Plumlee then petitioned the Nevada Supreme Court for a writ of mandamus to force Judge Lane to appoint outside counsel. The writ was denied.
Plumlee represented himself at trial. He was convicted by the jury and sentenced to two consecutive life terms in prison and two consecutive nine-year terms to run concurrently with the life terms.
On direct appeal, Plumlee claimed, inter alia, that the trial court’s denial of his motion to substitute counsel violated his Sixth Amendment right to counsel and that his resulting decision to represent himself was not voluntary. The Nevada Supreme Court dismissed the appeal. That court’s entire analysis of Plumlee’s claim was as follows:
Absent a showing of adequate cause, a defendant is not entitled to reject court-appointed counsel and substitute other counsel at public expense. Thomas v. State, 94 Nev. 605, 607, 584 P.2d 674, 676 (1978). It is within the sound discretion of the trial court to decide whether friction between counsel and client justifies appointment of new counsel. Id. A defendant’s refusal to cooperate with appointed counsel is no basis for a claim of inadequate representation. Id. at 608, 584 P.2d at 676. “Requiring a defendant to choose between waiving counsel and continuing with present counsel is not constitutionally offensive unless defendant’s objections to existing counsel are such that he has a right to new counsel.” State v. Staten, 60 Wash.App. 163, 802 P.2d 1384, 1387 (1991). Appellant never showed adequate cause justifying appointment of new counsel, and the court below did not abuse its discretion in refusing to do so.
The issue was never freshly analyzed by the state habeas courts, as both the trial and appellate habeas courts considered the issue foreclosed by the Nevada Supreme Court’s ruling on direct appeal.
Nonetheless, at Plumlee’s evidentiary hearing on state habeas, Judge Lane himself suggested that Plumlee’s distrust of the Washoe County Public Defender’s Office was justified. Though Judge Lane recognized that Plumlee had given his lawyers conflicting accounts of his involvement with the murder, and the judge ultimately credited both David Allison’s testimony that he had been candid with Plumlee about his plans to join the District Attorney’s Office and Shelly O’Neill’s testimony that she had not leaked information about Plumlee’s case,[3] the judge’s remarks indicate the reasonableness of Plumlee’s apprehensions about *916 the Washoe County Public Defender’s Office. Before hearing the state’s witnesses, for example, the judge said that he was inclined to believe Plumlee’s allegations regarding Allison and O’Neill:
I will tell you right now, I was aware of this a little bit while this was going on. I wasn’t aware what the depth of it was....
I think that Ms. O’Neill and the Public Defender’s Office was [sic] in dangerous waters. Certain inferences that can be drawn from what was going on in the case and her relationship or lack thereof with Mr. Dewey, what was said, not said to various people, I think that is extremely dangerous. I further think, and I would like to have him here to testify, I probably won’t unless the prosecution is going to bring him, I think it is terribly improper to know, I believe Mr. Allison did know that he was going to become a Deputy District Attorney and not tell [Plumlee] that. I think that was extremely out of line. I think it is unprofessional. I don’t think anything is wrong with going from one side of the street to the other as long as there are certain professional standards which are kept up with and met. I think it is inappropriate to tell a client facing a murder charge things that aren’t true. And I think that probably happened in this case. Knowing Mr. Allison, I think it did happen in this case.[4]
During the hearing, Allison testified that he too had been concerned with possible impropriety stemming from Shelly O’Neill’s relationship with John Dewey. Although he would later conclude that O’Neill had not leaked any confidential information, Allison recalled having a “confrontation” with O’Neill about her involvement in the case:
I knew that Shelly O’Neill knew this John Dewey. Now I had no — I had no concrete evidence. I didn’t know exactly what this information was, but the very idea, the very fact it might be happening enraged me. And I went to Shelly and told her that I found her behavior just unethical.... I felt that the mere appearance was not good for the office.
After the close of all the evidence, the judge maintained his view that Plumlee’s suspicions had been reasonable:
[I]t is clear Mr. Plumlee didn’t trust, didn’t like or trust the Public Defender’s Officer for reason. And based upon certainly where he was sitting, I can’t disagree he had a right to feel that.
Given the reasonableness of Plumlee’s perception of the events that led him to lose confidence in the Washoe County Public Defender’s Office, Judge Lane even suggested that he might be inclined to grant the petition had the state Supreme Court not (in his view) foreclosed the irreconcilable conflict/ forced self-representation argument. Judge Lane stated:
I certainly believe that the people that went to bat for him early on, and because of Mr. Dewey and because of Ms. O’Neill’s relationship with Mr. Dewey and because of all the information that *917 got wherever it got, I can understand why Mr. Plumlee felt like he did. I doggone sure can. If that issue hadn’t been, in my view at least, foreclosed in the Supreme Court on the direct appeal, maybe it would be a different kettle of fish. But that is not where we are.[5]
After exhausting review in the state courts, Plumlee filed this petition for a writ of habeas corpus in federal district court. The court denied the petition and rejected each of Plumlee’s seven asserted grounds for relief. The court analyzed Plumlee’s irreconcilable conflict claim under Supreme Court and Ninth Circuit precedent on an attorney’s duty of loyalty. Concluding that Plumlee had failed to show an actual conflict of interest that adversely affected his attorney’s performance, as required under Cuyler v. Sullivan, 446 U.S. 335, 348, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), the district court rejected Plumlee’s claim that the state trial court’s denial of his motion to have outside counsel appointed had forced him into self-representation.[6]
Plumlee appealed, and the district court issued a Certificate of Appealability under 28 U.S.C. § 2253(c) as to the single issue now before us. We therefore have jurisdiction under 28 U.S.C. § 2253(a).
II. ANALYSIS
A district court’s denial of habeas relief is reviewed de novo. Beardslee v. Woodford, 358 F.3d 560, 568 (9th Cir.2004). A habeas petitioner under 28 U.S.C. § 2254 cannot obtain relief based on a claim adjudicated on the merits in state court unless
the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.
28 U.S.C. § 2254(d).
When applying this standard, we review the “last reasoned decision by a state court.” Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir.2004) (citation and internal quotation marks omitted). In denying Plumlee’s substitution of counsel claim on state collateral review, the Nevada courts never analyzed the claim independently of the Nevada Supreme Court’s *918 single-paragraph discussion of the issue on direct appeal. It is therefore the Nevada Supreme Court’s opinion that we review under 28 U.S.C. § 2254.
“[C]learly established Federal law” under § 2254(d)(1) refers to “the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.” Lockyer v. Andrade, 538 U.S. 63, 71-72, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003).
The Supreme Court long ago firmly established principles pertaining to the right to counsel. To be assured of a fair trial, a criminal defendant “requires the guiding hand of counsel at every step in the proceedings against him.” Gideon v. Wainwright, 372 U.S. 335, 345, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (citation and internal quotation marks omitted). The Sixth Amendment “requires not merely the provision of counsel to the accused, but ‘Assistance,’ which is to be ‘for his de-fence.’ ... If no actual ‘Assistance’ ‘for’ the accused’s ‘defence’ is provided, then the constitutional guarantee has been violated.” United States v. Cronic, 466 U.S. 648, 654, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984) (quoting U.S. Const. amend. VI).
Supreme Court cases illustrate that constitutionally adequate representation can be vitiated not only where counsel has a conflict of interest arising from his duty of loyalty to another client, see, e.g., Cuyler v. Sullivan, 446 U.S. 335, 348, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), but also where counsel ceases to “function in the active role of an advocate.” Entsminger v. Iowa, 386 U.S. 748, 751, 87 S.Ct. 1402, 18 L.Ed.2d 501 (1967). Particularly instructive in the latter regard is Anders v. California, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), in which the Supreme Court confronted a California practice of refusing to appoint substitute appellate counsel where the first appointed counsel has reviewed the record and has opined to the court that his client’s appeal is merit-less. See id. at 739-740 & n. 2, 87 S.Ct. 1396. The Court held that this procedure was constitutionally inadequate, because it “did not furnish petitioner with counsel acting in the role of an advocate nor did it provide that full consideration and resolution of the matter as is obtained when counsel is acting in that capacity.” Id. at 743, 87 S.Ct. 1396 (emphasis added); see also Cronic, 466 U.S. at 656, 104 S.Ct. 2039 (“[T]he adversarial process protected by the Sixth Amendment requires that the accused have ‘counsel acting in the role of an advocate.’ ” (quoting Anders, 386 U.S. at 743, 87 S.Ct. 1396)).
Morris v. Sloppy, 461 U.S. 1, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983), upon which the State relies, did nothing to undermine the vitality of the requirement that counsel act as an advocate. In Morris, the Court rejected the theory that the Sixth Amendment encompasses the right to a “meaningful attorney-client relationship,” and consequently held that the defendant’s Sixth Amendment rights had not been violated by the trial court’s refusal to grant a continuance to enable the defendant’s preferred public defender to represent him. Id. at 12-14, 103 S.Ct. 1610. The habeas petitioner in Morris had initially presented his claim as one of irreconcilable conflict between- client and counsel, but the Court found that the defendant’s allegation of an irreconcilable conflict was simply unsupported on the facts of the case. See id. at 4, 103 S.Ct. 1610 (explaining that “[t]he facts shown by the record conclusively rebut” the claim of irreconcilable conflict); id. at 13, 103 S.Ct. 1610 (stressing that the defendant had told the trial court he was “satisfied” with the substitute public defender and had “specifically disavowed any dissatisfaction with counsel”). In rejecting the “meaningful relationship” theory on the law and the irreconcilable conflict theory on the facts, Morris demonstrates that *919 these two claims are distinct from each other. Thus, the Court’s holding that a defendant has- no right to a “meaningful relationship” with his attorney in no way suggests a retreat from the principle that the defendant is entitled to an attorney who acts as his advocate, or a rejection of the theory that an attorney-client relationship can be so dysfunctional as to render counsel unable to provide the constitutional minimum of adequate representation in the role of advocate.
The Court has helpfully summarized the distinction between the principle of attorney-as-advocate and the “meaningful relationship” claim rejected in Monis:
[I]n evaluating Sixth Amendment claims, the appropriate inquiry focuses on the adversarial process, not on the accused’s relationship with his lawyer as such. Thus, while the right to select and be represented by one’s preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers.
Wheat v. United States, 486 U.S. 153, 159, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988) (citations and internal quotation marks omitted) (emphasis added). . In other words, an impecunious defendant has no right to ask the court for a particular lawyer, but whoever is appointed must act as his advocate.
Although the Supreme Court, in applying these principles, has never considered the precise circumstances present in Plumlee’s case, the Court has explained that “[sjection 2254(d)(1) permits a federal court to grant habeas relief based on the application of a governing legal principle to a set of facts different from those of the case in which the principle was announced.” Lockyer, 538 U.S. at 76, 123 S.Ct. 1166. While the holdings of the Supreme Court are the indisputable focus of the “clearly established Federal law” inquiry, we have recognized that circuit precedent “may be persuasive authority for purposes of determining whether a particular state court decision is an unreasonable application of Supreme Court law, and may also help us determine what law is clearly established.” Robinson, 360 F.3d at 1057 (citations and internal quotation marks omitted); see also Williams v. Bowersox, 340 F.3d 667, 671 (8th Cir.2003) (“[T]he objective reasonableness of a state court’s application of Supreme Court precedent may be established by showing other circuits having similarly applied the precedent.”); Ouber v. Guarino, 293 F.3d 19, 26 (1st Cir.2002) (“To the extent that inferior federal courts have decided factually similar cases, reference to those decisions is appropriate in assessing the reasonableness vel non of the state court’s treatment of the contested issue.” (citation and internal quotation marks omitted)); Matteo v. Superintendent, SCI Albion, 171 F.3d 877, 890 (3d Cir.1999) .(en banc) (“[W]e do not believe federal habeas courts are precluded from .considering the decisions of the inferior federal courts when evaluating whether the state court’s application of the law was reasonable.”). “Therefore, when faced with a novel situation we may turn to our own precedent, as well as the decisions of other federal courts, in order to determine whether the state decision violates the general principles enunciated by the Supreme Court and is thus contrary to clearly established federal law.” Robinson, 360 F.3d at 1057.
We have elucidated the meaning of the Supreme Court’s right to counsel decisions in situations in which a severe conflict between counsel and client is said to deprive a defendant of his Sixth Amendment rights. In the foundational case on *920 this issue, we held: “[T]o compel one charged with grievous crime to undergo a trial with the assistance of an attorney with whom he has become embroiled in irreconcilable conflict is to deprive him of the effective assistance of any counsel whatsoever.” Brown v. Craven, 424 F.2d 1166, 1170 (9th Cir.1970) (citing Gideon and Entsminger) (emphasis added). A natural corollary of this holding is that where the erroneous denial of a motion to substitute counsel prompts a defendant to choose self-representation, reversal of the conviction is warranted in spite of the client’s “choice” to represent himself. United States v. Williams, 594 F.2d 1258, 1260 (9th Cir.1979) (per curiam). On the duty of a trial court to appoint substitute counsel in the face of irreconcilable conflict or complete breakdown in communication between counsel and client, there is near-unanimity among the circuits. See United States v. Mullen, 32 F.3d 891, 897 (4th Cir.1994) (holding that the trial court abused its discretion in refusing to appoint substitute counsel where “there was a total breakdown in communication between [counsel and client]” that “ma[de] an adequate defense unlikely”); Smith v. Lockhart, 923 F.2d 1314, 1320 (8th Cir.1991) (explaining that a defendant is entitled to a substitution of counsel where there exists “a conflict of interest, an irreconcilable conflict, or a complete breakdown in communication between the attorney and the defendant”); United States v. Padilla, 819 F.2d 952, 955 (10th Cir.1987) (same); Wilson v. Mintzes, 761 F.2d 275, 280 (6th Cir.1985) (same); United States v. Welty, 674 F.2d 185, 188 (3d Cir.1982) (same); United States v. Young, 482 F.2d 993, 995 (5th Cir.1973) (same); United States v. Calabro, 467 F.2d 973, 986 (2d Cir.1972) (same); see also United States v. Zillges, 978 F.2d 369, 372 (7th Cir.1992) (in evaluating motion to substitute counsel, court must consider several factors, including “whether the conflict between the defendant and his counsel was so great that it resulted in a total lack of communication preventing an adequate defense”); United States v. Allen, 789 F.2d 90, 92 (1st Cir.1986) (same); cf. United States v. Graham, 91 F.3d 213, 221 (D.C.Cir.1996) (“A defendant [has] the right to effective representation by appointed counsel, and this right may be endangered if the attorney-client relationship is bad enough.”).[7] These “convergent holdings” (all but one prior to the Nevada Supreme Court’s 1995 decision on Plumlee’s direct appeal)“reflected and applied clearly established federal law as determined by the U.S. Supreme Court” as of the time of the relevant state court decision. Robinson, 360 F.3d at 1059.
Having identified the governing legal principles, we must decide whether the Nevada Supreme Court’s decision was “contrary to” or “an unreasonable application of’ these principles. A state court’s decision is “contrary to” clearly established federal law where the state court “applies a rule that contradicts the governing law” set forth in Supreme Court cases or “confronts a set of facts that are materially indistinguishable” from a Supreme Court decision and nevertheless arrives at a different result. Williams v. Taylor, 529 U.S. 362, 405-06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state *921 court’s decision involves an “unreasonable application” of clearly established federal law where the state court “identifies the correct governing legal rule from [the Supreme] Court’s cases but unreasonably applies it to the facts of the particular state prisoner’s case,” or “either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.” Id. at 407, 120 S.Ct. 1495. Under the “unreasonable application” prong, relief may not be granted unless the state court decision was “objectively unreasonable,” as opposed to merely erroneous or even clearly erroneous. Lockyer, 538 U.S. at 75-76, 123 S.Ct. 1166.
In this case, the Nevada Supreme Court’s application of the imperatives we have identified from the Supreme Court’s right-to-counsel jurisprudence- — namely, counsel who is an advocate for the defendant, Anders, 386 U.S. at 743, 87 S.Ct. 1396; Entsminger, 386 U.S. at 751, 87 S.Ct. 1402, and who provides “actual Assistance for the accused’s defence,” Cronic, 466 U.S. at 654, 104 S.Ct. 2039 (citation and internal quotation marks omitted)— was objectively unreasonable.
Stemming from Plumlee’s objectively reasonable belief that his lawyers had betrayed him, the lack of trust on both sides was so severe that Plumlee’s attorney not only corroborated Plumlee’s claim that the relationship had broken down, but even made his own motion to be relieved. Cf. United States v. Moore, 159 F.3d 1154, 1160 (9th Cir.1998) (finding irreconcilable conflict where counsel told the court: “it seems to me that if Mr. Moore is forced to go to trial now with me as his attorney, that he will be denied a fundamental right; that is, to have counsel, effective, a zealous counsel”); United States v. D'Amore, 56 F.3d 1202, 1206 (9th Cir.1995) (finding irreconcilable conflict where counsel testified to his “inability to represent Defendant D’Amore in this matter”), overruled on other grounds, United States v. Garrett, 179 F.3d 1143, 1145 (9th Cir.1999) (en banc); United States v. Walker, 915 F.2d 480, 483-84 (9th Cir.1990) (finding irreconcilable conflict where counsel told the court: “I do believe that there is, given his refusal to confer with me, there is a[sic] irreconcilable difference that does prevent me from representing him”), overruled on other grounds, United States v. Nordby, 225 F.3d 1053, 1059 (9th Cir.2000), in turn overruled, United States v. Buckland, 289 F.3d 558, 568 (9th Cir.2002) (en banc). After Plumlee went pro se, Gregory strenuously objected to being appointed standby counsel. Gregory’s words are notable:
To order us to be stand-by counsel, in effect, gives him no stand-by counsel. ... [H]e doesn’t trust us and, frankly, Judge, I don’t trust the relationship that I have with Mr. Plumlee.... 7 am going to beg the Court to appoint outside counsel to act as legal advisor for Mr. Plumlee.
(emphasis added).
Even more compelling than Gregory’s assessment were the words of the trial judge himself, who, during the state habe-as proceedings, took the unusual step of second-guessing his own previous denial of Plumlee’s motion:
[I]t is clear Mr. Plumlee ... didn’t like or trust the Public Defender’s Officer for reason. And based upon certainly where he was sitting, I can’t disagree he had a right to feel that.
[B]ecause of Mr. Dewey and because of Ms. O’Neill’s relationship with Mr. Dewey and because of all the information that got wherever it got, I can understand why Mr. Plumlee felt like he did. I doggone sure can. If that issue hadn’t been, in my vieiv at least, foreclosed in *922 the Supreme Court on the direct appeal, maybe it would be a different kettle of fish.
(emphasis added).
Plumlee’s relationship with the members of the Washoe County Public Defender’s Office was broken beyond repair. Plumlee knew it. Gregory knew it. By the time Judge Lane had finished with the case, he knew it too.
This is not a case in which the client-counsel conflict resulted simply from the defendant’s obstinance or delaying tactics. To the extent Plumlee did not cooperate with the lawyers of the Public Defender’s Office, his behavior was an inevitable byproduct of his apprehensions — which the very judge who denied Plumlee’s motion to substitute counsel later indicated were reasonable — about his lawyers’ loyalty and willingness to be true advocates for him. Plumlee believed that two of his lawyers had betrayed him and that another thought he was crazy. Though Judge Lane ultimately found that Plumlee’s suspicions of disloyalty were untrue, the judge “doggone sure” could “understand why Mr. Plumlee felt like he did.”
The conflict that resulted was acute. Addressing the judge in open court, Steven Gregory likened the Public Defender’s representation of Plumlee to no representation at all. We must agree.[8]
Under these unusual circumstances, holding that Plumlee received representation that comported with the Sixth Amendment guarantee of counsel who is an advocate for the defendant, Anders, 386 U.S. at 743, 87 S.Ct. 1396; Entsminger, 386 U.S. at 751, 87 S.Ct. 1402, and who provides “actual Assistance for the accused’s defence,” Cronic, 466 U.S. at 654, 104 S.Ct. 2039 (citation and internal quotation marks omitted), was not merely erroneous but objectively unreasonable. See Lockyer, 538 U.S. at 75-76, 123 S.Ct. 1166. A defendant simply cannot be expected to cooperate with attorneys he reasonably believes are working behind his back to undermine his defense. In this case, Plumlee’s reasonable perception of this type of betrayal — on the part of not one but two different attorneys in the Washoe County Public Defender’s Office — led to an obvious and extreme conflict that constructively deprived Plumlee of any meaningful representation as the Supreme Court has understood that term.[9]
*923 Having shown that an irreconcilable conflict with his lawyer deprived him of actual assistance of counsel, a habeas petitioner need not make the further showing that the trial judge’s erroneous refusal to appoint substitute counsel resulted in prejudice, because “[ajctual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice.” Strickland v. Washington, 466 U.S. 668, 692, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); see also Moore, 159 F.3d at 1158.[10]
The trial court violated Plumlee’s Sixth Amendment right to counsel by refusing to appoint substitute counsel in the face of an irreconcilable conflict between Plumlee and his attorney. As a result, Plumlee’s decision to represent himself cannot be considered voluntary, and his conviction therefore cannot stand. Williams, 594 F.2d at 1260.
Before concluding, we feel we must briefly respond to the dissent’s accusations that we are distorting the facts, introducing a subjective and “rudderless” standard into the law, and inviting “volumes of litigation” by encouraging defendants to concoct conspiracy theories about their defense attorneys.
As to our interpretation of the facts, the dissent’s criticism is largely directed at a straw man. Specifically, the dissent characterizes our opinion as crediting Plum-lee’s suspicions about his lawyers’ perfidy as'actually based on fact. We make no such contention. Rather, we conclude only that Plumlee’s suspicions were objectively reasonable. This conclusion is relevant to demonstrate that “the conflict was not of [the defendant’s] own making,” a finding that would defeat Plumlee’s claim of entitlement to substitute counsel. Schell v. Witek, 218 F.3d 1017, 1026 (9th Cir.2000) (en banc).
According to the dissent, by considering Plumlee’s “objectively reasonable belief’ in evaluating whether the irreconcilable con *924 flict was of Plumlee’s own making, we have applied a subjective and “rudderless” standard. This charge relies on a highly selective reading of our opinion. In particular, the dissent ignores the phrase “objectively reasonable,” which we have deliberately employed to modify “belief.” The dissent also mischaracterizes our opinion as suggesting that a defendant’s beliefs alone entitle him to new counsel. We have said nothing of the kind. What entitled Plum-lee to new counsel was not the fact. of Plumlee’s suspicions themselves (however reasonable) but the irreconcilable conflict these suspicions engendered.
Finally, despite the dissent’s dire predictions, we do not open the door for defendants and habeas petitioners to flood the courts with Sixth Amendment claims by conjuring up groundless fears about their attorneys. We have never held that a defendant can simply manufacture a conflict out of thin air and demand new counsel; we certainly do not so hold today. A defendant is simply not entitled to new counsel if “the conflict was ... of [the defendant’s] own making.” Schell, 218 F.3d at 1026. As our discussion indicates, the conflict between Plumlee and his lawyers arose from objectively reasonable (though not necessarily accurate) suspicions, rather than from a self-serving attempt by Plumlee to sabotage his attorney-client relationship in order to obstruct or delay the proceedings. We cannot imagine that the extraordinary circumstances present here — appointed counsel who precipitously withdraws to accept a position with the prosecutor’s office, another public defender’s continuing close relationship with the defendant’s roommate (a potential suspect in the case), the resulting and fully understandable incapacity of the second appointed counsel to gain the defendant’s trust, and finally the second counsel’s heartfelt report to the court that his representation of the defendant is the equivalent of no representation at all — will often, if ever, be replicated, or that our opinion could spawn the “volumes of litigation” our dissenting colleague fears.
III. CONCLUSION
The Sixth Amendment entitles a defendant to counsel who “function[s] in the active role of an advocate.” Entsminger, 386 U.S. at 751, 87 S.Ct. 1402. This is clearly not what Plumlee got. The trial court should have appointed new counsel for Plumlee; its failure to do so deprived Plumlee of his right to counsel under the Sixth Amendment. The Nevada Supreme Court’s ruling to the contrary “involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States.” 28 U.S.C. § 2254(d)(1) (internal punctuation modified).
We therefore reverse and remand with instructions to grant a conditional writ of habeas corpus ordering that petitioner be released unless the state retries him within a reasonable time as set by the district court.
REVERSED AND REMANDED.

. The first motion to relieve counsel is actually styled a motion to be relieved as counsel, but the text indicates it was made on behalf of Plumlee, not the Public Defender's Office. It was not until the trial court’s hearing on the motion that it became clear Gregory was making his own motion to be relieved as well.

. In one of the hearings, Plumlee explained that he did not question Gregory's legal abilities. “The problem,” Plumlee told the judge, “is one of trust.” Later on, under questioning from the judge focusing on Steven Gregory’s competence, Plumlee responded "yes” when asked if he thought Gregory was competent, and "yes” again when asked if he trusted Gregory. However, in light of Plum-lee's repeated motions to substitute counsel, Plumlee's repeated insistence throughout the rest of the proceedings that he did not trust the Public Defender’s Office or its members, and Gregory's own testimony about the lack of trust between lawyer and client, this second "yes” by Plumlee appears to be a slip of the tongue in response to the judge's vigorous attempt to talk Plumlee out of going pro se, rather than a reflection of the true state of Plumlee's relationship with his appointed counsel.

. In a federal habeas proceeding, a presumption of correctness attaches to state court findings of fact. 28 U.S.C. § 2254(e)(1).

. The dissent accuses us of taking these remarks out of context; in particular, the dissent calls attention to Judge Lane’s characterizations of O’Neill’s and Allison’s apparent improprieties as "not dispositive.” But these characterizations must be taken in their proper context as well. Judge Lane’s commentary throughout the hearing reflects his belief that Plumlee’s irreconcilable conflict claim was foreclosed in the state habeas proceeding because of the prior opinion of the state supreme court. In light of this view, it is clear that the issue regarding which the apparent improprieties were "not dispositive,” according to the judge, was Plumlee’s ineffective assistance of counsel claim, a claim that was at issue in the state habeas proceeding but is not before us in the instant appeal.

. Judge Lane’s remarks are not entirely consistent with regard to his view of the underlying merits of the irreconcilable conflict claim. When pressed by Plumlee's habeas counsel to consider this claim, Judge Lane replied:
That is rejected. It is rejected for this reason: One of these days we are going to realize that there has to be some limit here. People cannot come in and say, "Gee, it wasn’t the lawyer I wanted.” I don’t care. The Public Defender is there for a reason. You get the Public Defender. They may not be the best. I happen to think they are not too bad. They may not be the best. You may find some don't do the job. That is what they are there for. They get paid to do it. That is who you get. If you don't like it, too bad. If you want to hire your own lawyer, hire them.
Given that Judge Lane steadfastly maintained that the issue had already been settled, these remarks might best be understood as a defense of the state Supreme Court's ruling by which the judge considered himself bound. In any event, Judge Lane never retreated from his characterization of Plumlee’s distrust of his lawyers as reasonable.

. As the remainder of our opinion makes clear, the district court did not address the gravamen of Plumlee’s claim. Plumlee does not claim that external commitments compromised his counsel’s loyalty; rather, Plumlee claims that the complete breakdown in their relationship compromised his counsel’s ability to act as his advocate at all.

. The Eleventh Circuit has not definitely ruled on the viability of an irreconcilable conflict claim. That court’s most relevant decision to date is Thomas v. Wainwright, 767 F.2d 738 (11th Cir.1985). While it cited the Fifth Circuit's Young decision for the proposition that a trial court should inquire into the reasons behind an alleged client-counsel conflict, the court in Thomas held that, on the facts of that case, no Sixth Amendment violation had occurred because it was the defendant's own obstinance that had thwarted the trial court’s efforts to understand the alleged conflict. Id. at 741-43.

. Recently, in United States v. Gonzalez-Lopez, - U.S. -, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006), the Supreme Court reaffirmed that the Sixth Amendment guarantees not only the right to legal counsel, but also the distinct right of a criminal defendant to be represented by his attorney of choice. Writing for the majority, Justice Scalia further held that "erroneous deprivation of the right to counsel of choice” is structural error requiring the reversal of a subsequent conviction. Id. at 2564. The Court also explicitly noted that the right to counsel of choice "does not extend” to cases in which defendants "require counsel to be appointed for them.” Id. at 2565.
Plumlee's claim is different. He was deprived entirely of legal counsel. The deprivation he suffered is different in kind and even greater than that suffered by Gonzalez-Lopez. To be sure, Plumlee claims that he did not want to be represented by his particular attorney. But the constitutional violation was not that he was denied "the right to counsel of [his] choice.” Id. at 2562. Instead, it was that the justifiable distrust of his attorney became so acute that Plumlee was denied his clearly established Sixth Amendment right to have an attorney "acting in the role of an advocate.” Anders, 386 U.S. at 743, 87 S.Ct. 1396.

. We note that the same result obtains if we apply our own circuit's test for evaluating the denial of a motion to substitute counsel. Under this test, we consider three factors: (1) the timeliness of the motion, (2) the adequacy of the court’s inquiry into the conflict between client and counsel, and (3) the extent of the conflict itself. Moore, 159 F.3d at 1158-59.
Here, there is no question that Plumlee's motion was timely, as he made it on three separate occasions commencing more than a month before trial was originally scheduled to *923 begin. See, e.g., id. at 1159, 1161 (finding timely a motion to substitute counsel made two and a half weeks before trial); D’Amore, 56 F.3d at 1206-07 (finding timely a motion made on the eve of a probation revocation hearing where the defendant had attempted to communicate his request to the court ten days earlier).
The adequacy of the trial judge's inquiry here presents a closer question. By the time he denied Plumlee’s final motion to substitute counsel, Judge Lane had discussed the conflict with both Plumlee and his attorney, but some of the inquiry inappropriately focused on counsel's competence rather than the conflict between client and counsel, see United States v. Adelzo-Gonzalez, 268 F.3d 772, 778 (9th Cir.2001); Walker, 915 F.2d at 483, and the judge did not question client and counsel "privately and in depth,” Moore, 159 F.3d at 1160.
It is the third factor, the extent of the conflict, that tips the scales strongly in Plumlee’s favor, as our main analysis makes clear.
By noting the confluence of our analysis of Plumlee’s claim with well-established circuit law, we do not mean to suggest that we are faulting the Nevada Supreme Court for failing to analyze Plumlee’s claim precisely as we would have. Applying our own test and arriving at the result that Supreme Court precedent dictates merely serves to buttress our conclusion that the Nevada Supreme Court's decision was an objectively unreasonable application of clearly established Supreme Court law.

. Although we refused to apply a per se prejudice rule to the irreconcilable conflict claim in Schell v. Witek, 218 F.3d 1017 (9th Cir.2000) (en banc), that case involved a defendant’s counsel-substitution motion that the court had essentially lost. Id. at 1021, 1025-26. We therefore remanded for an evidentia-ry hearing regarding the extent of the conflict and whether the conflict resulted in the constructive denial of counsel. Id. at 1027-28. Importantly, we noted: "In the event that the trial court determines that a serious conflict did exist that resulted in the constructive denial of assistance of counsel, no further showing of prejudice is required.” Id. at 1027 (citing Strickland, 466 U.S. at 692, 104 S.Ct. 2052).